O. & W. THUM CO. v. DICKINSON.

SAME v. A. K. ACKERMAN CO.

(Circuit Court of Appeals, Sixth Circuit.   August 1, 1917.   Petition for
Rehearing Denied November 6, 1917.)

Nos. 2906, 2907.

1. TRADE-MARKS AND TRADE-NAMES ⬥⧫58—INFRINGEMENT.
    Complainant's trade-mark for sticky fly paper, consisting of printed
matter and arbitrary designs printed in black ink on the sheets, *held* in-
fringed by defendant.

2. TRADE-MARKS AND TRADE-NAMES ⬥⧫58—INFRINGEMENT—IMITATION.
    In testing the charge of infringement of trade-mark or of unfair com-
petition, consideration must be given to the question whether the re-
semblances so far dominate the differences as to be likely to deceive
ordinary purchasers; and the purchasers most to be considered are
the ultimate users rather than jobbers and retailers; also the larger
features of resemblances, instead of the subordinate points of differences,
must control.

3. TRADE-MARKS AND TRADE-NAMES ⬥⧫55—INFRINGEMENT—INTENT.
    It is not necessary to the maintenance of a charge of infringement of
trade-mark to prove a distinct intent on the part of the infringer; but
it is the fact of infringement, and the consequent invasion of the good
will and business of the owner of the mark, that is controlling, and the
intent will be presumed.

4. TRADE-MARKS AND TRADE-NAMES ⬥⧫60—UNFAIR COMPETITION—IMITATION
OF DRESS.
    When a manufacturer has, through a particular trade dress, as by the
size of the article, and of the cartons and cases in which it is marketed,
so identified his product as to indicate that it is his, every principle of
fair dealing and fair trade forbids the adoption by a subsequent com-
petitor of the same dress, without otherwise effectively distinguishing it
from that of the first user.

5. TRADE-MARKS AND TRADE-NAMES ⬥⧫70(4)—UNFAIR COMPETITION—IMITA-
TION OF DRESS.
    Defendant *held* chargeable with unfair competition in imitating in
size and marking the sheets of fly paper made by complainant, an older
manufacturer, with an established business and reputation, and also
of the cartons and cases in which the same was marketed, to such
extent as to justify the inference that the similarity was intentional, and
for the purpose of deceiving purchasers.

6. TRADE-MARKS AND TRADE-NAMES ⬥⧫93(3)—SUIT FOR UNFAIR COMPETITION
—PROOF OF INTENT.
    To establish unfair competition, it is not necessary to prove intent by
direct evidence, where it is clearly to be inferred from circumstances.

7. MONOPOLIES ⬥⧫21—VIOLATION—DEFENSE TO SUIT FOR INFRINGEMENT.
    A suit for infringement of trade-mark and unfair competition cannot
be defended on the ground that complainant has violated the anti-trust
laws.

8. TRADE-MARKS AND TRADE-NAMES ⬥⧫86—SUIT FOR INFRINGEMENT—LACHES.
    Where the action of a defendant in imitating the trade-marks and
trade dress of complainant was progressive, new features of similarity
being added from time to time, complainant is not chargeable with
laches in delaying to bring suit, which deprives it of the right to an in-
junction, although the delay may affect its right to an accounting for the
full period.

⬥⧫For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

9. TRADE-MARKS AND TRADE-NAMES ⬤➔70(2)—UNFAIR COMPETITION—USE OF MISLEADING NAME.

Complainant and its predecessors had·been for many years engaged in the manufacture of sticky fly paper in Grand Rapids, Mich., and had extended its business until its product was known throughout the country, when defendant went into the business in Grand Rapids under the trade-name of "Grand Rapids Sticky Fly Paper Company." He marked such name, and also the word "Sticky," on the sheets of his product, and later marked the cases in which it was shipped "Grand Rapids Sticky Fly Paper." *Held* that, while complainant had never used the name "Grand Rapids" in connection with its product, except to designate its place of business, both such name and the word "sticky" had come to be identified by consumers with its product, and that the use made of them by defendant tended to deceive purchasers, and should be enjoined.

10. TRADE-MARKS AND TRADE-NAMES ⬤➔68—"UNFAIR COMPETITION."

The essence of "unfair competition" consists in palming off, either directly or indirectly, one person's goods as the goods of another.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Unfair Competition.]

Appeals from the District Court of the United States for the Southern Division of the Western District of Michigan, and from the District Court of the United States for the Eastern Division of the Northern District of Ohio; Clarence W. Sessions, Judge.

Suits in equity by the O. & W. Thum Company against Albert G. Dickinson and against the A. K. Ackerman Company. From the decrees, complainant appeals. Reversed.

Chappell & Earl, of Kalamazoo, Mich., and Kleinhans, Knappen & Uhl, of Grand Rapids, Mich., for appellant.

Willard F. Keeney and Roger C. Butterfield, both of Grand Rapids, Mich., for appellees.

Before WARRINGTON, Circuit Judge, and COCHRAN and HOLLISTER, District Judges.

WARRINGTON, Circuit Judge. June 11, 1914, the O. & W. Thum Company, a Michigan corporation, brought suit in the United States District Court for the Western District of Michigan, Southern Division, against Albert G. Dickinson, a citizen and resident of Grand Rapids, Mich., to enjoin his alleged infringement of a registered trade-mark; and on July 14th following the same company commenced suit in the United States District Court for the Northern District of Ohio, Eastern Division, against the A. K. Ackerman Company, an Ohio corporation, to enjoin its alleged infringement of the same trade-mark and also for unfair competition.[1] The defendants answered and the two cases were heard together and decided upon the evidence so presented; and a decree was entered in each case dismissing the bill, with costs. The Thum Company appeals from each decree.

[1] September 4, 1914, District Judge Sessions, of the Western District of Michigan, was designated in aid of the judges of the district to hold the District Court of the United States for the Northern District of Ohio, and to hear and determine all matters arising in the suit there brought against the Ackerman Company as stated.

⬤➔For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The two bills of complaint are in the main similar in averment and in relief sought as to alleged infringement of trade-mark; the chief differences in averment relate, in the Dickinson suit, to certain alleged conduct of defendant Dickinson, and, in the Ackerman suit, to acts alleged in respect of that company as a broker engaged in the sale of Dickinson's products, while injunctive relief additional to that sought to restrain infringement is prayed in the Ackerman suit respecting certain acts charged in the bill as constituting unfair competition.[2]  The plaintiff and defendant in the first case are rivals in the manufacture and sale of sticky fly paper; and the plaintiff and defendant in the second case are rivals in the sale of such paper.  The defendant in the second case handles and sells only such paper as the defendant Dickinson produces, though by no means all; and this includes sheets of fly paper, cartons, and cases, such as Dickinson causes to be placed upon the market.  If we ascertain, then, what the two main rivals, plaintiff and defendant in the first suit, have done and are doing in this line of business, we shall at the same time learn substantially all that is done by the Ackerman Company.

The plaintiff's predecessors began the manufacture of sticky fly paper about 1883 at Grand Rapids, Mich., and the business has ever since been continued in that city by such predecessors and the plaintiff. The defendant Dickinson, through a corporation, began the same business in Grand Rapids in 1902, and (through that corporation and another and later individually) he has been engaged in this business since that time.  The business of the Thum Company and that of defendant have been developed into large proportions, extending throughout this country and into foreign countries.  The evidence has taken a wide range, and has brought out a number of controversies, which so far as necessary will be noticed as we progress.

[1] I. *Infringement of Trade-Mark.*  The Thum Company has several registered trade-marks.  The particular mark which is claimed to be infringed is No. 57,567, entitled "Trade-Mark for Sticky Fly Paper," and was registered November 13, 1906.  The following appears in the statement found in the certificate of registration:

"The trade-mark has been continuously used in the business of said corporation by it and its predecessors, from whom it derived title, since January, 1888, * * * and the particular description of goods * * * upon which the said trade-mark is used is sticky fly paper."

And in the verified declaration it is stated that the trade-mark had been in actual use as a trade-mark of applicant or its predecessors

---

[2] Presumably the two suits were brought against the respective defendants and in separate jurisdictions, and the bills differentiated as stated, for the purpose of testing both the question of infringement of the registered trade-mark and that of the claimed unfair competition; and this course was probably adopted because of the lack of diversity of citizenship in the first suit.  Burt v. Smith, 71 Fed. 161, 163, 17 C. C. A. 573 (C. C. A. 2); Air-Brush Mfg. Co. v. Thayer, 84 Fed. 640, 641 (C. C.).  Whether, in view of the fact that the validity of the trade-mark here involved is not questioned, it was necessary to resort to the second suit, need not be considered; but we remark that it is difficult to determine in some instances, as respects each of the bills, whether the effect of particular allegations is to charge infringement or unfair competition, and this difficulty extends to some of the evidence.

"for ten years next preceding the passage of the act of February, 1905 [Act Feb. 20, 1905, c. 592, 33 Stat. 724], and that to the best of his (affiant's) knowledge and belief such use has been exclusive." Neither of these statements nor the validity of the trade-mark is questioned.

The trade-mark so registered consists of an assemblage of figures shown in black ink and arranged as follows: (a) One full ellipse, centrally located, and near each end of its major axis a fractional ellipse, all arranged in succession, with their major axes extending lengthwise of the sheet on which the figures are displayed; (b) four circles disposed thus, one above and one below the adjacent parts, respectively, of the complete ellipse and each fractional ellipse; (c) the borders of the ellipses and circles may be said to be in the form of a scroll, the several borders having four figures, each resembling a bowknot, one at each end of the major and minor axes of the complete ellipse, and, so far as shown, of each fractional ellipse, and also at points equidistant upon the periphery of each circle.

According to one of defendant Dickinson's exhibits he made application to register a trade-mark in 1914, consisting of one full and two fractional elliptical figures, which so far as shown are so nearly true ellipses that they may fairly be called one full ellipse and two fractional ellipses, with their major axes disposed lengthwise of the sheet. Their borders are in single lines and terminate at each end of the major axes in what seems to be a Maltese Cross. A panel bordered in single line is disposed centrally within each main and fractional ellipse. Four sketches of flies in enlarged scale are disposed similarly to the four circles of plaintiff's trade-mark. The defendant's entire mark, as it was used throughout 1914 and as it has been since, is shown in black ink.

The statement accompanying defendant's application contains the following:

"The trade-mark has been continuously used in my business and in the business of my predecessor, the Grand Rapids Sticky Fly Paper Company, of Grand Rapids Michigan, * * * since 1904."

Defendant offered testimony to show that this application was practically allowed August 31, 1914, which as we have seen was after the instant suits were begun. Attention, however, has been called to a decision of the Court of Appeals of the District of Columbia rendered April 2, 1917, in a case between the parties to the first of the present suits, in which the decision of the Commissioner of Patents allowing the defendant Dickinson's application, was reversed. Judge Robb, in announcing the opinion, said of the two marks here in question:

"Comparing the two marks, we cannot escape the conviction that there has been a studied attempt on the part of the applicant to put on the market a fly paper closely resembling that of opposer."

In the practical use that has been made of these two marks certain matter has been displayed upon them to which attention should be called. Within the full ellipse and fractional ellipses of plaintiff's mark the word "Tanglefoot" has been carried, which in itself is a trade-mark and was registered by plaintiff, in connection with other matter, December 11, 1894, No. 25,660, and was registered separately, in spe-

cial style of type, November 13, 1906, No. 57,566. The validity of this mark is not in dispute. Within the four circles of plaintiff's mark the following appears:

(a) "In cool weather warm slightly before opening;" (b) "Catches the germ as well as the fly; (c) "Pat. in the United States and Canada, trade-mark registered;" (d) "Ask for Tanglefoot, it is the best fly destroyer."

Beneath the complete ellipse it is stated:

"Made by the O. & W. Thum Co., Grand Rapids, Mich., U. S. A., and Walkerville, Ont., Canada."

The word "Sticky" is displayed within the complete and fractional ellipses of defendant, though only the ends of the four interior letters appear above and below the panels before mentioned, and upon each panel it is stated:

"The best fly paper, kills fly and germ, not poisonous."

The letters of "Sticky," so far as shown, are in form similar to those of "Tanglefoot." The following appears immediately above the main ellipse:

"Open slowly; if paper tears, warm slightly."

And immediately below:

"Grand Rapids Sticky Fly Paper Co., Grand Rapids, Mich., U. S. A.'

[2] Now, whether we consider these two marks according to their respective forms alone, or in connection with the accompanying matter of each, we fail to discover any reason for the resemblances brought about, unless the purpose was to imitate. The main figures of each are elliptical in form and disposed alike upon the sheets bearing the marks. The four circles of plaintiff's mark and the four flies of defendant's mark are positioned alike with reference to the complete and fractional ellipses. The test is to be found in the ensemble. If, for instance, an ordinary view is taken of all the parts together of each mark, so that each part is considered in relation to the whole, a substantial resemblance is apparent. It is in this way, since it is the natural way, that effective impressions of users are acquired; and the tendency to confuse one mark with the other, when either is seen separately, must be evident as respects the average purchasing user. The tendency here to confuse ultimate users—indeed, to enable the palming off of defendant's goods as those of plaintiff—is made more certain and continuous by the fact that the marks of plaintiff and defendant, respectively, are exposed on both sides of every sheet of sticky fly paper put out by either; and thus in dealings between retailers and ultimate users these marks necessarily come to the view of such users both before their purchases and afterwards. It is to be observed, moreover, that in testing the charge of infringement, as well as that of unfair competition, consideration must be given to the question whether the resemblances so far dominate the differences as to be likely to deceive ordinary purchasers; and the purchasers most to be considered are the ultimate users, rather than jobbers and retailers, since they, like all middlemen, are interested in and have the means of identifying the manufacturers of the goods they pur-

chase. W. A. Gaines & Co. v. Turner-Looker Co., 204 Fed. 553, 556, 123 C. C. A. 79 (C. C. A. 6); Coca-Cola Co. v. Gay-Ola Co., 200 Fed. 720, 723, 119 C. C. A. 164 (C. C. A. 6); Royal Baking Powder Co. v. Royal, 122 Fed. 337, 345, 58 C. C. A. 499 (C. C. A. 6); Singer Manufacturing Co. v. Wilson, 2 Ch. D. 434, 442; Singer Manufacturing Co. v. Loog, 18 Ch. D. 395, 412; Celluloid Manuf. Co. v. Cellonite Manuf. Co. (C. C.) 32 Fed. 94, 97, per Mr. Justice Bradley on the circuit; G. Heileman Brewing Co. v. Independent Brewing Co., 191 Fed. 489, 497, 112 C. C. A. 133 (C. C. A. 9); Improved Fig Syrup Co. v. California Fig Syrup Co., 54 Fed. 175, 178, 4 C. C. A. 264 (C. C. A. 9); Liggett & Myer Tobacco Co. v. Hynes, 20 Fed. 883, 885 (D. C.); Lawrence Manuf. Co. v. Lowell Hosiery Mills, 129 Mass. 325, 328, 37 Am. Rep. 362; L. E. Waterman Co. v. Standard Drug Co., 202 Fed. 167, 171, 120 C. C. A. 455 (C. C. A. 6), and citations; Samson Cordage Works v. Puritan Cordage Mills, 211 Fed. 603, 610, 128 C. C. A. 203, L. R. A. 1915F, 1107 (C. C. A. 6); L. E. Waterman Co. v. Modern Pen Co. (D. C.) 193 Fed. 242, 247, per Judge Learned Hand, modified 197 Fed. 534, 536, 117 C. C. A. 30 (C. C. A. 2), affirmed as modified, 235 U. S. 88, 35 Sup. Ct. 91, 59 L. Ed. 142.

Why, out of the exhaustless variety of geometric figures and of methods of grouping should the defendant Dickinson have adopted figures and grouping substantially like those of plaintiff's mark? A purpose to appropriate a trade-mark in substantial part could scarcely be more manifest. A feature kindred to this appears in a matter of color and to which we have not thus far alluded. Until the manufacturing season of 1912–1913 defendant Dickinson displayed his main ellipse and fractional ellipses, together with the panel and printed matter thereon, in red ink. He then began to change the color to black, and in 1914, and since, has continuously printed his mark in black ink. The excuse given for this change is one of expense though it is not shown that some color, other than black, might not have been adopted with reasonable economy; and, apart from the bearing this change has in the other case upon the question of unfair competition, it also tends to support the charge of infringement, since it extends and emphasizes the resemblances between the two marks. True, the ellipses differ in dimensions and in borders, the ellipses of the plaintiff being greater in minor axes, though less in major axes, than those of the defendant; and, of course, the four circles of the former are not the four flies of the latter; yet the similarity of the main figures, and especially in the entire arrangement, rather than the differences mentioned is likely to be kept in mind by the average user. The larger features of resemblance, instead of the subordinate points of difference, must control. As this court said in De Voe Snuff Co. v. Wolff, 206 Fed. 420, 423, 124 C. C. A. 302, 305, speaking by Judge Knappen:

"* * * It is not necessary, to constitute infringement, that every element of a trade-mark be appropriated, nor that the trade-mark be completely copied. A proper test is whether, taking into account the resemblances and differences, the former are so marked that the ordinary purchaser is likely to be deceived thereby."

In Singer Manufacturing Co. v. Wilson, supra, Sir George Jessel said (at page 442):

"A trade-mark, to be taken, need not be exactly copied; it need not be copied even with slight variations; but it must be a substantial portion of the trade-mark."

See W. A. Gaines & Co. v. Turner-Looker Co., supra, 204 Fed. at page 556, 123 C. C. A. at page 79; Ohio Baking Co. v. National Biscuit Co., 127 Fed. 116, 120, 62 C. C. A. 116 (C. C. A. 6); Layton Pure Food Co. v. Church & Dwight Co., 182 Fed. 24, 35, 104 C. C. A. 464 (C. C. A. 8); Kostering v. Seattle Brewing & Malting Co., 116 Fed. 620, 621, 54 C. C. A. 76 (C. C. A. 9); "Singer" Machine Manufacturers v. Wilson, 3 App. Cas. 376, 394, bottom; The Upper Assam Tea Co. v. Herbert & Co., 7 Eng. Patent, Design and Trade-Mark Cases, 183, 186; Edelsten v. Edelsten, 7 L. T. Rep. (N. S.) 768, 769; McLean v. Fleming, 96 U. S. 245, 251, 253, 255, at page 256, 24 L. Ed. 828, Mr. Justice Clifford saying:

"Two trade-marks are substantially the same in legal contemplation, if the resemblance is such as to deceive an ordinary purchaser giving such attention to the same as such a purchaser usually gives, and to cause him to purchase the one supposing it to be the other."

[3] It is not necessary to the maintenance of a charge of infringement of a trade-mark to prove a distinct intent on the part of the infringer; it is the fact of infringement and the consequent invasion of the good will and business of the owner of the mark that is controlling; the intent will be presumed. De Voe Snuff Co. v. Wolff, supra, 206 Fed. at page 424, 124 C. C. A. 302; McLean v. Fleming, supra, 96 U. S. at pages 253, 254, 24 L. Ed. 828; Lawrence Mfg. Co. v. Tennessee Mfg. Co., 138 U. S. 525, 549, 11 Sup. Ct. 396, 34 L. Ed. 997; Samson Cordage Works v. Puritan Cordage Mills, supra, 211 Fed. at page 608, 128 C. C. A. 203, L. R. A. 1915F, 1107; W. A. Gaines & Co. v. Turner-Looker Co., supra, 204 Fed. at page 556, 123 C. C. A. 79; Hygeia Distilled Water Co. v. Consolidated Ice Co., 144 Fed. 139, 141, 142 (C. C., opinion by present Circuit Judge Buffington); Hutchinson, Pierce & Co. v. Loewy, 163 Fed. 42, 90 C. C. A. 1 (C. C. A. 2); Layton Pure Food Co. v. Church & Dwight Co., supra, 182 Fed. at page 33, 104 C. C. A. 464; "Singer" Machine Manufrs. v. Wilson, 3 App. Cas. 376, 391.

As regards the words and names carried on the fly sheets of the respective parties, we do not understand it to be claimed that they alone are of controlling importance upon the question of infringement; they, of course, are pertinent to the question of unfair competition. There is here a degree of similarity, however, which contributes to the resemblances found in the two marks. This will be seen by comparison of some of the words already pointed out. For example, it is stated on one of the circles of plaintiff's mark, "In cool weather, warm slightly before opening;" while it is stated immediately above the main ellipse of defendant's mark, "Open slowly; if paper tears, warm slightly." Again, on plaintiff's "Catches the germ as well as the fly;" and upon the panels of defendant's ellipses, "The best fly paper, kills fly and germ, not poisonous." Nor would the

ordinary purchasing user, when desiring to purchase an article as well known as sticky fly paper, discriminate between the prominent words carried within the ellipses of the respective marks, the plaintiff using "Tanglefoot," and the defendant Dickinson "Sticky"; and the same thing is true, we think, as to the names shown on the marks. The plaintiff's name there appears as the maker of the article, while the defendant Dickinson's name is not shown at all on his mark, but only the name under which he conducts his business—"Grand Rapids Sticky Fly Paper Co."; and it is plain that, if the defendant's mark is not calculated to distinguish his sticky fly paper from that of plaintiff, the name under which he conducts his business would afford but slight, if any, aid in this respect.

Upon the whole, we conclude that defendant's mark infringes the trade-mark of plaintiff.

[4, 5] II. *The Ackerman Company Case—Infringement and Unfair Competition.* The registered trade-mark involved here is the same as that passed on in the first suit; and the holding of infringement there must result in a like ruling here. We have seen that diversity of citizenship exists in this case; and although the bill alleges and seeks relief from both infringement and unfair competition, there is no reason why such causes of action may not be joined (Samson Cordage Works v. Puritan Cordage Mills, supra, 211 Fed. at 608, 609, 128 C. C. A. 203, L. R. A. 1915F, 1107, and citations [C. C. A. 6]); indeed, this is in effect admitted. The issue of unfair competition embraces a variety of subjects. These subjects may be conveniently grouped under the complaint that the Ackerman Company receives and disposes of the Dickinson fly paper in cases, cartons, and sheets substantially like those of plaintiff. As we understand the testimony of Morris Ackerman, vice president of the Ackerman Company, that company had been selling the product of Dickinson and his predecessor for some 10 years prior to 1914. True, Ackerman states that his company had been representing the Grand Rapids Sticky Fly Paper Company for that time; but, while a corporation by that name was formed by Dickinson in 1904, and the business was conducted by it for a time, yet the corporation was suffered to "lapse" (as Dickinson states) shortly thereafter, and the business was taken over by Dickinson, and has ever since been conducted by him under the name of that company. We may therefore look into the evidence concerning the Dickinson packages and their contents during the period that the Ackerman Company has been handling them.

The evidence, as a whole, clearly shows that at the time the Ackerman suit was commenced the cases, cartons, and sheets of fly paper put out by Dickinson and handled by the Ackerman Company were in many respects identical with those of the plaintiff. Comparing these articles of plaintiff with those of defendants: (a) The cases (wooden boxes) are of the same dimensions, seemingly of the same kind of wood, and made and inclosed in the same way; and some of them bear close resemblance, also, in their external dress. For the purpose of showing distinct resemblances, we may refer to two of the cases in evidence, one of plaintiff and the other of defendant.

First as to the top of each: The words "This side up" are shown in black letters within a parallelogram defined by black lines; at the left of the figure are the words, in red, "Keep Dry," displayed on plaintiff's within a half circle in black outlines, and on defendant's within a rectangle in black outlines, and at the right the words, in red, "Never store in basement" shown on both within a rectangle defined by black outlines; and beneath these devices similar space is preserved for the consignee's address. Second, as to the sides of each: Within corresponding parallelograms defined by double black lines certain words and names appear, which, though differing in themselves, are so arranged and colored as to present remarkable similarity; thus "Tanglefoot" on the one and "Grand Rapids" on the other are shown in red letters along the length and upper portion of the respective parallelograms, but with the first and last letters of "Tanglefoot" and of the name "Grand Rapids" enlarged, so as to extend across nearly the entire width of the parallelogram; underneath the short letters of "Tanglefoot" and within the main parallelogram is another similar, though much smaller, figure in black outlines, with a scroll bracket at each end, and within this figure is carried in black letters the name of plaintiff and in red letters its place of business; while immediately under the short letters of "Grand Rapids" (on defendant's case) appears in red letters " 'Sticky' Fly Paper," and underneath, within a parallelogram much smaller than and contained in the main one, appears in black letters "G. R. Sticky Fly Paper Co.," and in red letters Dickinson's place of business. Third, as to the ends of each: Quite similar border scroll work is imprinted in black on one end of each of these cases; within the scroll work is carried in black letters, on plaintiff's, "Tanglefoot," and, on Dickinson's, "Grand Rapids"; there appears on both in red "10 Boxes 250 Double Sheets"; likewise in red, "Keep Dry"; also in red, on plaintiff's, "Fly Paper," and on Dickinson's, "Sticky Fly Paper." It is to be noticed that included within the language so displayed on defendant's case, another and different name for defendant's product is shown on both sides and one end of the case, to wit, "Grand Rapids Sticky Fly Paper." The significance of this will be appreciated when it is recalled that defendant Dickinson does business under the name Grand Rapids Sticky Fly Paper Co., and that both plaintiff and Dickinson manufacture sticky fly paper at Grand Rapids; in other words, "Grand Rapids Sticky Fly Paper" is quite as descriptive of plaintiff's fly paper as of defendant's. This case was put on the market in 1914. Other cases of the respective parties are in evidence; but the objections made to defendant's other cases are not so much in matters of resemblance in colors and arrangement as in the use of certain words and pictures, as, for example, "Sticky" and pictures in greatly enlarged scale of flies, concerning which something will be said later.

Turning, now to a comparison of the cartons used by the plaintiff and the defendants: (b) They are of the same size, and, seemingly, of the same material; they are adjusted in length and width so as to admit of convenient packing in the cases, and each contains 25 double sheets of fly paper. Other features of resemblance are found on the

face and edges of each carton lid. On the face these words appear in black, "25 double sheets," "Fly Paper," "Keep Dry"; on both side edges of plaintiff's, "Do not stand on edge"; on one side edge and on one end edge of defendant's, "Do not stand on edge"; on one end edge of plaintiff's "Keep very dry"; on one end edge of defendant's, "Keep very dry"; and on one side edge of defendant's, "Do not place in basement." The differences on the tops of the lids are as follows: On plaintiff's, additional to what has already been pointed out, the word "Tanglefoot" is shown in prominent black letters across a circle containing a cut designed to represent the rising sun, and upon a peripheral border of the circle the name of plaintiff and its places of business at Grand Rapids, Mich., and Walkerville, Canada, all centrally located; while on the defendant's appear the name under which Dickinson conducts his business—"Grand Rapids Sticky Fly Paper Co."—and his place of business, "Grand Rapids, Mich.," with the word "Sticky" prominently displayed in red and a panel thereon bearing the words, "The best fly paper, catches fly and germ, is not poisonous," and also sketches of two flies in greatly enlarged scale imprinted on the carton with eyes in red, with bodies shading from black into red and wings from red into white, and all centrally located. The bottom of plaintiff's carton is blank, while that of defendant carries a number of pictures and words.

Coming to a comparison of the fly sheets put out by the plaintiff and the defendants: (c) They are of the same size [8] and of the color of manilla paper, though there is a controversy as to their relative qualities; they are double sheets and held together until used (1) by the sticky matter spread over their interior faces, so as to leave a border of more or less depth from their edges, and (2) by adhesive matter placed upon such border for the purpose of preventing escape of the sticky matter; and, as pointed out in the infringement case, the plaintiff imprints its registered trade-mark and the defendant Dickinson his mark, on both the outside and inside faces of their respective double sheets. What was said of these marks in the infringement case should be remembered here.

Now, it is to be observed of the resemblances above pointed out that they did not all occur at one time. The evidence is convincing that the defendant Dickinson adopted a progressive course. There is, however, an exception to this. It is the identity in sizes. It is shown that the fly sheet of plaintiff is the same in size as that of other and older manufacturers of fly paper. From this it is contended that defendant had the right to use the same sized sheet; and that this right operated to fix the size alike of the cartons and the cases; in other words, that the sizes arose from the necessities of this situation. Plaintiff's type of fly sheet (so far as used in this country) is 9 by 15⅝ inches. It is shown that fly sheets differing materially in dimensions from plaintiff's have been used in this country. The fault, then, in defendant's contention as to necessity for like sizes, is to be found in his voluntary selection of a fly sheet exactly the size of plain-

---

[8] There is an exception to this which should be noticed. Plaintiff seems to use a smaller sheet than this, though only in its export traffic.

tiff's. We do not mean by this to intimate that plaintiff has an exclusive right to the sizes of its fly sheet and packages; on the contrary, we think it has not. Granting the right, however, in defendant Dickinson to select the same sizes as those of plaintiff, it is perfectly clear that he must exercise the privilege so as not wrongfully to interfere with plaintiff's continued exercise of the same right. Wotherspoon v. Currie—Glenfield Starch Case, 5 Eng. & Irish App. 508, 514. What must challenge attention here is that the sizes of plaintiff's case, carton, and fly sheet constitute part of the details which go to make up its trade packages and the dress in which it had been accustomed to place them on the market. It will not do for a subsequent maker of a product like that of the first user to segregate the details of the earlier trade packages and dress, and then, on the theory that the first user does not possess an exclusive right to them separately, appropriate them in whole or in substantial part by piecemeal; and yet this is the theory on which the defendant Dickinson's claims are for the most part bottomed. This ignores the first user's grouping of parts, of details, for the very purpose of denoting the origin of his product; it is through such distinctive characteristics, considered in a unitary way, that the first user and the public can be protected against confusion and deception as to his product. Wherever, then, the first user has through a particular trade dress, as here, so identified his product as to indicate that it is his, every principle of fair dealing, fair competition, forbids any subsequent user of the same product to adopt any part of the first user's dress without otherwise effectively distinguishing his dress from that of the first user. We may observe, in this connection, that the facts of the instant case plainly distinguish it from the decision of this court in Globe-Wernicke Co. v. Fred Macey Co., 119 Fed. 696, 703, 56 C. C. A. 304, and relied on here. The Globe-Wernicke Company had depended on a patent, which proved to be void, to safeguard its claimed exclusive right to manufacture its product, instead of relying on a particular trade dress or trade-mark to denote the origin of its product; and this distinction is recognized in the opinion itself. It results that, by adopting and persisting in the use of plaintiff's sizes of packages and fly sheet, defendant Dickinson incurred and still rests under an obligation at least to avoid still further and material similarity through the dress applied to his packages. It is hard to see that defendants have observed any such rule.

Turning attention again to the progressive course pursued by the defendant Dickinson, but few illustrations are necessary to make this clear. One is found in the external dress of his cases of 1914. Prior to that year the dress of defendant's cases, although changed from time to time, was not in either color or arrangement, as already pointed out, particularly objectionable; but a distinct change was made in the dress for that year. We have just described this dress by comparison with that of one of the cases of plaintiff; and we need only to refer to what was there said in order to show the resemblances introduced through the advance then made in defendant's dress. The particular case of plaintiff with which such comparison was made

had been used by it before and during the year 1913. The plaintiff, it is true, made some changes in the dress of its case for 1914; but they are of minor character and do not operate to alter the striking resemblances of the dress whether the comparison be made with respect to plaintiff's dress of 1913 or 1914.

As to the cartons, apt illustration of defendant's encroachment by degrees upon plaintiff's carton is found in the identity of the language in terms already shown to be displayed on the edges of the carton lids. This identity could not have been the result of either accident or necessity; it must have come about through design. It was shown that before 1909 there was some difference between the words employed by the respective parties, as, for instance, plaintiff's directions were, "Do not stand on edge;" "Keep very dry;" but in the year named defendant changed his directions and made them exactly like plaintiff's. Defendant even changed his method of securing the corners of the carton lid from metal clasps to "paper corners," the same as plaintiff had used for years, and also changed to that of plaintiff the method of holding the carton lid in place.[4]

An illuminating example of defendant's progression appears on both the outside and inside faces of the fly sheets. It will be borne in mind that in the infringement suit we described the figures and matter imprinted on these sheets. It appears that the defendant's first design for his fly sheet consisted of two full ellipses defined in red lines, with a red Maltese cross shown at the extremities of the major axes, but with the four flies disposed, two above and two below the ellipses, at points opposite their respective minor axes; this design also bore the words, in red letters within and without the ellipses, which are set out in the infringement suit. An important change, however, was made in this design. The two full ellipses were replaced by a single ellipse centrally located, with fractional ellipses at the ends of its major axis. This change brought the four flies into the same relation with the full ellipse and the fractional ellipses that the four circles bear to the complete and fractional ellipse of plaintiff's registered trade-mark. Defendant's final change came when he converted his red ellipse and fractional ellipses, with the matter displayed within them, into black. We have already in substance stated that the testimony to the effect that this change was necessary as a matter of expense is not convincing. It seems to us that the reason for the change is to be found in the purpose obviously to be inferred from

---

[4] It is worthy of notice that the sketches in enlarged scale of flies, shown on defendant's carton, seem to have originated with plaintiff. Plaintiff shows, without contradiction, that, before defendant engaged in the fly paper business, plaintiff purchased from a lithographing company, for use, 250,000 show cards on which was displayed "a large fly with shadings of red on the head and back," and a sketch of a fly in enlarged scale, with eyes in red, is shown in one of plaintiff's exhibits upon the face of a fly sheet bearing an imprint of plaintiff's registered trade-mark. There is enough similarity between the two sets of sketches to give rise to a fair inference, despite denial, that the sketches appearing on defendant's cartons had their origin in the sketches of plaintiff.

the gradual encroachments made upon the plaintiff's mark rather than in the slightly increased cost shown.

What, then, is to be deduced from the resemblances described and the method of gradual change in bringing them about? This method cannot be misunderstood. The effect of every step in the process was more or less to imitate something theretofore existing in plaintiff's trade-mark or trade dress. This course consumed time and evidently involved deliberation; and in view of the sequel every step was toward a definite end. The course thus pursued appears to have avoided present opposition and contest and so to have secured the advantage of the use of the parts so taken; but it did not conceal the intent with which the encroachments were evidently made. In view of the culmination reached in 1914, it is vain to assert that the resemblances so brought about are not material. This ignores the most obvious purpose that can be predicated of the course pursued, and ascribes to the originator of the scheme a lack of resource that is not deserved; above all, it fails to observe the accomplishment of the purpose in the resemblances ultimately achieved. These resemblances would be more fully appreciated, if it were feasible to reproduce their effect here in color and form. It is not necessary again to endeavor to point out the resemblances and confusing features of defendant's mark and trade dress. Repetition of an example or two of their effect, however, may not be amiss. The effect of the change in color of defendant's mark necessarily comes to the notice of every purchasing consumer. It is printed, as we have seen, on both the outside and inside surfaces of every double fly sheet; and, notwithstanding the interior coating of the sticky matter, the mark is visible on the inside as well as the outside, so that the sheet cannot even be used without displaying defendant's mark fully in the same color, black, as that of plaintiff's. One of the confusing features, also, of defendant's trade dress, is shown, as already stated, on its cases of 1914. Defendant Dickinson, not satisfied with the name under which his business is conducted, "The Grand Rapids Sticky Fly Paper Co.," prominently places on both sides and one end of his cases these words, "Grand Rapids Sticky Fly Paper." No explanation that explains has been given for this; and, since both plaintiff and defendant Dickinson are producing and shipping sticky fly paper at Grand Rapids, it would be difficult to select words more calculated to confuse than these. There are other illustrations quite as convincing, but further repetition is not required.

[6] The essence of unfair competition consists in palming off, either directly or indirectly, one person's goods as the goods of another, and this, of course, involves an intent to deceive. Testimony was offered tending to show that defendant's goods had been mistaken for and confused with the goods of plaintiff. This is disputed in several ways; but we do not find it necessary to try to reconcile or to determine the weight of this testimony. It is not necessary to prove intent by direct evidence, where it is clearly to be inferred from circumstances. Scarcely anything of an evidential nature, for example, could more certainly characterize intent than repeated imitation of

material parts of another person's trade tokens; the imitations themselves reveal the object. Further, in our judgment, the resemblances and confusing features shown in respect of defendant's output are themselves calculated to lead users to believe that it is the plaintiff's output, and so to deceive them, and such consequences, inevitable in their nature, justify an inference of wrongful intent to secure "some part of the benefit of the good will and reputation of the plaintiff's trade." Johnson v. Orr Ewing, 7 App. Cas. 219, 226; Elgin Nat. Watch Co. v. Illinois Watch Co., 179 U. S. 665, 674, 21 Sup. Ct. 270, 45 L. Ed. 365; Samson Cordage Works v. Puritan Cordage Mills, supra, 211 Fed. at 608, 128 C. C. A. 203, L. R. A. 1915F, 1107 (C. C. A. 6); Fuller v. Huff, 104 Fed. 141, 145, 43 C. C. A. 453, 51 L. R. A. 332 (C. C. A. 2); Helmet Co. v. Wm. Wrigley, Jr., Co., 245 Fed. 824, —— C. C. A. ——, decided August 1st (C. C. A. 6); Braham v. Beachim, 7 Ch. D. 848, 856; Collinsplatt v. Finlayson, 88 Fed. 693 (C. C.); Bissell Chilled Plow Works v. T. M. Bissell Plow Co., 121 Fed. 357, 372 (C. C.); Meccano v. Wagner, 234 Fed. 912, 918 (D. C.); Wm. Wrigley, Jr., Co. v. L. P. Larson, Jr., Co., 195 Fed. 568, 570 (C. C.); Von Mumm v. Frash, 56 Fed. 830, 837 (C. C.); Wirtz v. Eagle Bottling Co., 50 N. J. Eq. 164, 168, 24 Atl. 658; Northwestern Knitting Co. v. Garon, 112 Minn. 321, 326, 128 N. W. 288.

It must therefore be concluded that placing these goods on the market, whether by the producer or his selling agent, the Ackerman Company, imports an intent to have them mistaken for and confused with plaintiff's product; and in determining the effect of this, it is not enough to consider simply the jobber or the retailer, though of course their interests are entitled to protection. As we in effect said when passing on the question of infringement of plaintiff's trade-mark, jobbers and retailers are cautious buyers and have the means of identifying manufacturers when negotiating their purchases; but it is well known that all jobbers and retailers are not so considerate of either the interests or the choice of unsuspecting users. The subject, then, cannot be fully considered unless the interests of purchasing users are taken into account.[5] It results that plaintiff is entitled to relief.

[7] III. *Nature and Extent of Relief.* Under averments of the answer in each of the suits, and also evidence offered at the trial, it is urged that plaintiff has in various ways sought to monopolize the sticky fly paper business, and so is not here with clean hands or entitled to any relief. It may be assumed that in these matters the plaintiff is amenable to actions in appropriate proceedings; certainly some

---

[5] Upon this point we may add to the citations above given in the trade-mark infringement suit the following: N. K. Fairbank Co. v. R. W. Bell Manuf'g Co., 77 Fed. 869, 875, 23 C. C. A. 554 (C. C. A. 2), followed in Hansen v. Siegel-Cooper Co., 106 Fed. 690, 691 (C. C.); Helmet Co. v. Wm. Wrigley, Jr., Co., supra; Wotherspoon v. Currie, supra, 5 Eng. & Irish App. at 517; Lever v. Goodwin, 36 Ch. D. 1, 3, 7; Bissell Chilled Plow Works v. T. M. Bissell Plow Co., supra, 121 Fed. at 366 (C. C.); National Biscuit Co. v. Baker, 95 Fed. 135, 136 (C. C.); R. Heinisch's Sons Co. v. Boker, 86 Fed. 765, 768 (C. C.); Cauffman v. Schuler, 123 Fed. 205, 206 (C. C.); Shredded Wheat Co. v. Humphrey Cornell Co. (D. C.) 244 Fed. 508, 518, 522.

of the acts charged, if true, could not be sanctioned; but plainly such wrongs as are set out cannot be redressed in actions like these. Upon this feature of the cases we agree with the learned trial judge, who, in speaking of these complaints, said:

"And it is the settled law that tort actions like these cannot be successfully defended upon the ground that plaintiff has violated the laws prohibiting monopolies and unlawful attempts to monopolize." [6]

[8] It is urged further that through its laches and acquiescence plaintiff is estopped to claim any relief. It is true that it was not until 1914 that plaintiff took active measures to interfere with the course pursued by either of the defendants. This presents another effect of the progressive course of encroachment, already considered; such a course does not tend to arouse hostile action until it is fully developed; indeed, this happened; plaintiff does not appear to have regarded the situation as requiring active interference until near the opening of the fly paper season of 1914, when, as we have seen, radical and apparently permanent changes in the Dickinson trade-mark and trade dress were introduced. Plaintiff then took definite action, both through written notices and the institution of suits. In these circumstances we cannot think the defendants can shield themselves behind the charge of laches; this would be to ignore the fact that the true design of the partial encroachments, of the continuing trespass, did not develop until the culmination in 1914; permanent benefits in the good will and trade reputation of another cannot be acquired in this way. Still this is not to say that the full measure of relief sought should be granted. Even if laches and acquiescence could rightfully be imputed to plaintiff, it might well be denied an accounting of profits for a substantial portion of the encroachment period, and yet be granted relief by injunction as to the future. Hanover Milling Co. v. Metcalf, 240 U. S. 403, 418, 419, 36 Sup. Ct. 357, 60 L. Ed. 713. Further, it is not necessary to the due protection of plaintiff's trade tokens that an injunction should go to all their minutiæ; relief that will operate to prevent confusion and deceit as to the origin of the products of the respective parties, with a limited accounting, is all that should be granted; as nearly as may be, the decrees should be formulated so as to fix conditions that will admit of full and fair competition but destroy unfair competition.

[9] Provision will be made in the decrees as to infringement to enjoin the respective defendants permanently from using the Dickinson elliptical device or mark in issue, as it is imprinted and shown on the fly sheets, in any manner or for any purpose whatever connected with the fly paper business. The decree as to unfair competition will permanently enjoin the A. K. Ackerman Company, defendant: (a) From selling or in any wise disposing of any sticky fly sheets bearing

[6] In support of this the following cases were cited: Coca-Cola Co. v. Gay-Ola Co., 200 Fed. 720, 726, 119 C. C. A. 164 (C. C. A. 6); Prest-O-Lite Co. v. Davis, 209 Fed. 917, 919 (D. C.), affirmed 215 Fed. 349, 357, 131 C. C. A. 491 (C. C. A. 6); Searchlight Gas Co. v. Prest-O-Lite Co., 215 Fed. 692, 697, 131 C. C. A. 626 (C. C. A. 7); Shaver v. Heller & Merz Co., 108 Fed. 821, 834, 48 C. C. A. 48, 65 L. R. A. 878 (C. C. A. 8).

an impression of such infringing mark, or any of the cases produced or used by defendant Dickinson in 1914, or since then, and bearing on their sides and one end the words "Grand Rapids Sticky Fly Paper," together with the external dress which is particularly described in this opinion; and, subject to the conditions hereinafter provided for, (b) from selling or in any wise disposing of any of the Dickinson products which bear the words "The Grand Rapids Sticky Fly Paper Co." [7] and the word "Sticky."

This requires separate consideration. We cannot repress a conviction that the tendency of these words when so used is necessarily to confuse and mislead in respect of the origin of the product; and this accords, too, with some of the testimony. The words describe with equal accuracy the place of manufacture, Grand Rapids, and the products alike of the plaintiff and the defendant Dickinson; the Ackerman Company handles the Dickinson product without change of these words; and all this is done without trying to avoid the misleading effect of the words. It is practically conceded that plaintiff's predecessors began the manufacture and sale of sticky fly paper at Grand Rapids some 19 years in advance of Dickinson, and that plaintiff has continued the business there ever since.[8] It is true that plaintiff's predecessors were not the original manufacturers of sticky fly paper at Grand Rapids, yet they were the first to enter upon the business there in a large way and to develop it into a general commercial success. Their development of trade in sticky fly paper at Grand Rapids tended naturally to create a belief in many persons that sticky fly paper produced at Grand Rapids—in other words, "Grand Rapids Sticky Fly Paper"—meant their product; this association of Grand Rapids with sticky fly paper has been preserved by plaintiff, and necessarily as well as according to some of the testimony, a like belief still prevails that sticky fly paper there produced is that of the plaintiff. True, neither plaintiff nor its predecessors ever collocated the name of the place of manufacture and that of the product into a single phrase; but no amount of phrasing could accentuate the fact that through its predecessors and itself plaintiff has during all these years produced and sold sticky fly paper at Grand Rapids. It is therefore impossible to dissociate plaintiff's product from the name "Grand Rapids," or the words "sticky fly paper," or even the word "Sticky"; the name no more certainly describes plaintiff's place of manufacture than the word "sticky," when used in connection with fly paper, characterizes its product; indeed, its registered trade-mark, "Tanglefoot," has for all the years mentioned been known to denote sticky fly paper.

[7] Controversy has arisen between counsel as to the rights of the respective parties to use this name, each claiming an exclusive right in the name. This grows out of the decision in People v. Sticky Fly Paper Co., 144 Mich. 221, 231, 107 N. W. 1119; but that decision is not helpful to either side.

[8] We have in mind that plaintiff in a less conspicuous way shows upon its packages that it has another place of business at Walkerville, Canada; but this does not alter the fact that its only place of business in this country is at Grand Rapids, nor does it diminish the liability to confusion of the products turned out at Grand Rapids.

What limitation, then, should be placed upon the adoption and use by another of these words as a trade-name under which to carry on the same business at the same place? We recognize the fact that granting relief against a long-standing appropriation like this is attended with difficulty; but, in view of what we have already said concerning the claim of laches, we are not disposed to believe that the present situa-tion is remediless, since its duration without explanation has amounted to a continuing trespass. The appropriation was made in the very be-ginning of defendant Dickinson's connection with the fly paper business and by a corporation with which he was officially and financially con-nected. It is manifest that the object was at once to identify the new enterprise with the old one then in operation at Grand Rapids, and so to gain substantial benefits from this established business; and we are satisfied that this object still prevails in material degree. It is vain to suppose that the name, "The Grand Rapids Sticky Fly Paper Co.," would have been adopted, or that its use would be so strenuously per-sisted in, if the object stated was not and is not the true one; it is simply a contradiction for the appropriator of the name to question its beneficial effect. Indeed, it is now in effect insisted that these words must be treated as signifying the product of defendant Dickinson; but, in the sense that Dickinson is generally known in the enterprise, this cannot be correct. Mr. Dickinson has never associated his individ-ual name with his business name. His own name nowhere appears on his fly sheet, carton, or case; nothing has been done to indicate the manufacturer of the product or the proprietorship, except only through display of the business name in dispute.

A different question would have arisen, if his own name had been associated prominently with the business name he assumed. The case in that event would have been more like Kellogg Toasted Corn Flake Co. v. Quaker Oats Co., 235 Fed. 657, 668, 669, 149 C. C. A. 77 (C. C. A. 6), since the parties there distinguished their respective products, "toasted corn flakes," by associating names with these purely descrip-tive words, which prevented confusion of their products. However, many persons may, and no doubt do, associate sticky fly paper with the *company* indicated by the business name under consideration, and also with the term "Sticky," when found in connection with that name. But this states the difficulty; it does not solve it. The rights of the first user, plaintiff, with its predecessors, and the liability to confuse the Dickinson goods with the plaintiff's clearly remain, and must be reckoned with. It must be conceded that we have found no decision, and none has been cited, which deals with a situation just like this. It is not, for instance, precisely like the class of decisions typified by the Glenfield Starch Case. The town of Glenfield had been associated with the starch of a particular manufacturer (plaintiff) as a name, "Glenfield starch," by which the article was known; and the respondent, although subsequently producing and selling starch at Glenfield, was restrained from using the name "Glenfield" in connection with his starch in such a way as to deceive.

[10] Such cases are bottomed on the principle that any later and un-qualified use of the name by another in producing and selling a similar

article at the same place is to misrepresent, is to commit a fraud, since the necessary effect is to palm off his article as that of the earlier user. It is a long-settled doctrine of equity, however, that courts are not concerned with the particular method or form through which the goods of one person are disposed of as the goods of another. It cannot be, for instance, that this end is prohibited only when it is effected through simulation of a technical trade-mark. Wherever the use of a name or of words or designs involves duplicity, in the sense that they can be employed to make the forbidden misrepresentation, such use must be open to relief that is calculated to prevent the mischief, or else it must be confessed that equity in dealing with fraud has at last found its limitation. The Lord Chancellor said in the Camel Hair Case—Reddaway v. Banham, A. C. (1896) 199, 207:

"What in each case or in each trade will produce the effect intended to be prohibited is a matter which must depend upon the circumstances of each trade, and the peculiarities of each trade."

See, also, Ludlow Valve Mfg. Co. v. Pittsburgh Mfg. Co., 166 Fed. 26, 29, 92 C. C. A. 60 (C. C. A. 3), per Circuit Judge Gray.

The present assumed trade-name reveals the fact that tne so-called company produces and sells sticky fly paper at Grand Rapids; but it does not even in a remote way intimate, much less reveal, the further fact that there is another and older producer and seller of sticky fly paper at Grand Rapids. Thus the assumed name has a double meaning; and its greatest value, at least to the person using it, lies in its duplicity. Reddaway v. Banham, supra, A. C. (1896) at 218, 219. This is intensified by the proved if not conceded fact that Grand Rapids is known as the "home of sticky fly paper"; and the inevitable effect is to misrepresent the facts concerning Grand Rapids sticky fly paper, and to enable unscrupulous dealers to put out the Dickinson product as the plaintiff's product. The commonest principles of unfair competition forbid this, and it would seem to follow that all further use of the assumed name should be enjoined; still, in view of the geographic and otherwise descriptive character of the words in issue, we do not think the use of the name ought to be prohibited absolutely. The relief granted against the use of such words has developed from apparent absolute prohibition into conditional prohibition. In the Glenfield Starch Case, for instance, the injunction granted would seem on its face to have been intended as an unconditional restraint. Wotherspoon v. Currie, supra, at page 523. Yet the decree has since been construed to mean that the respondent should not use Glenfield "in such a way as to deceive" (Camel Hair Case, supra, [1896] A. C. 212); in the Stone Ale Case the injunction was made absolute in terms, and although for reasons stated by the Lord Justices they affirmed the decree entered below, yet they expressed the belief that it would have been better, had defendant been restrained from using the word "Stone" in connection with his product, "without clearly distinguishing" it from that of the plaintiff (Montgomery v. Thompson, [1891] A. C. 217, 221). In the Camel Hair Case the defendants were enjoined from "using the words 'Camel Hair' as descriptive of or in connection with belting manufactured by them * * * without clearly distinguishing such

belting from the belting of the plaintiffs." Camel Hair Case, supra, at 222.

The theory is that it is sufficient so to qualify the use as to prevent the mischief; and this in substance is the familiar and settled rule in the courts of this country. Herring, etc., Co. v. Hall, etc., Co., 208 U. S. 554, 559, 28 Sup. Ct. 350, 52 L. Ed. 616; French Republic v. Saratoga Vichy Co., 191 U. S. 427, 435, 24 Sup. Ct. 145, 48 L. Ed. 247; G. & C. Merriam Co. v. Saalfield, 198 Fed. 369, 373, 117 C. C. A. 245 (C. C. A. 6); Knabe Bros. Co. v. American Piano Co., 229 Fed. 23, 30, 31, 143 C. C. A. 325 (C. C. A. 6); Kellogg Toasted Corn Flake Co. v. Quaker Oats Co., supra, 235 Fed. at pages 667, 668, 149 C. C. A. 77. The names in issue in the English cases, as well as in most of those of our own courts, just mentioned, had acquired in each instance a secondary meaning, and if we are right in the belief that the words in issue in the instant case have acquired the secondary meaning already pointed out the case is ruled by these decisions. Upon this hypothesis it is impossible to escape application of the principle declared by this court, when speaking through Judge Denison, in the Dictionary Case, supra (G. & C. Merriam Co. v. Saalfield, 198 Fed. at 373, 117 C. C. A. 245):

"The alleged trespassing defendant has the right to use the word, because in its primary sense or original sense the word is descriptive; but, owing to the fact that the word has come to mean, to a part of the public, something else, it follows that, when the defendant approaches that same part of the public with the bare word, and with nothing else, applied to his goods, he deceives that part of the public, and hence he is required to accompany his use of the bare word with sufficient distinguishing marks normally to prevent the otherwise normally resulting fraud."

However, we do not rest our decision on the rule of secondary meaning alone. There is analogy both in fact and principle between the appropriation of a trade-name having a secondary meaning and the appropriation of words which as here pertinently describe the location and product of, and injuriously affect, a previously established business. The only perceivable difference between two such appropriations is in matter of form rather than in substance; each amounts to a misrepresentation; it is true as to the former a priority in right of use is treated by the decisions as residing in the primary user, yet as to the latter (apart from any existing secondary meaning) there is manifestly a continuing trespass upon a previously established good will and trade. This cannot in reality amount to a distinction so far as wrongful injury is concerned; and we therefore see no reason why the rule of relief that is employed in cases of secondary meaning may not be applied here, nor why the particular wrong here committed, though novel, should not be redressed.

It must follow that, unless and until effective qualification and explanation are made of the use of the name under which defendant Dickinson conducts his business, and also of the term "Sticky" as it is applied to his product, which will unmistakably differentiate his product from plaintiff's the Ackerman Company (since Dickinson is not a party to the unfair competition suit) will be enjoined from selling or in any wise disposing of such product in any form or manner what-

ever which bears either such business name or term. Just what qualification should be made as to the use of this business name and term cannot now be justly determined. Counsel for plaintiff in their brief have suggested explanatory words that cannot be accepted. Counsel for defendants have made no suggestion in this behalf presumably because of their belief that no qualification can rightfully be imposed. In these circumstances we have concluded that proper restriction can better be determined by the trial judge upon hearing from the parties. It will be provided, however, in each decree, that the respective defendants shall be permitted to sell, as now marked and dressed, such finished stock, including fly sheets, as either may have on hand at the date of the filing of this opinion, on giving satisfactory bond to account for such profits and damages resulting from the sale of the stock as the plaintiff may ultimately be found entitled to.

An accounting in the usual form will be allowed against each defendant for such profits and damages as may have accrued since the dates in 1914 of the written notices given by plaintiff to the defendants, respectively, and in effect requesting them to discontinue the acts complained of later in the respective bills; this is for the reason that despite the evidential significance of the encroachments made before these dates, as already pointed out, plaintiff made no objection or claim in respect of them and must be concluded to have condoned them so far as remuneration is concerned.

The orders of injunction herein provided for will, in addition to what has already been specified, restrain the defendants in the respective cases from doing any acts that will in the one instance infringe the registered trade-mark of plaintiff, or that will tend in the other instance to imitate or to create confusion respecting the mark or dressing employed by plaintiff upon its fly sheet, carton, or case, or that will tend in either instance to accomplish the same ends through advertisement.

The decree in each case will be reversed, and the case remanded for further proceedings in accordance with this opinion.

On denial of petition for rehearing the following court order was entered:

"Ordered that the petition for rehearing be denied. However, the inference stated in the fourth footnote to the opinion was inadvertently drawn from resemblance between Dickinson's sketch and both of plaintiff's sketches therein mentioned, instead of the resemblance alone between Dickinson's sketch and plaintiff's first sketch; so considered, we think the inference should be withdrawn. This withdrawal, however, affects the evidence only in a cumulative sense, and hence is not material."