## GLOBE–WERNICKE CO. v. FRED MACEY CO.

(Circuit Court of Appeals, Sixth Circuit. November 5, 1902.)

### No. 1,039.

**1. PATENTS—INVENTION—SECTIONAL BOOK CASES.**

The Wernicke patent, No. 557,737, for improvements in sectional bookcases, construed, as to claims 12, 15, 16, 17, 18, 19, and 20, and held to exhibit no more than a judicious selection of well-known devices, obvious in their uses, and the application of the same to the construction of book cases, and therefore void for lack of invention.

**2. EQUITY PLEADING—AMENDMENT OF BILL.**

Where a bill presents a case in a double aspect, by charging that certain acts of defendant constitute an infringement of a patent and also unfair competition, praying relief on both grounds, an order sustaining a demurrer addressed to the bill in one aspect is merely interlocutory, and remains subject to revision by the court until final decree, and the court may at any time permit an amendment relating to that feature of the bill.

**3. UNFAIR COMPETITION—RIGHT TO PROTECTION.**

A claim of unfair competition cannot be sustained on allegations that complainant has built up a large business in the manufacture and sale of sectional bookcases having certain general characteristics, such as variety in size, style, finish, and kind of wood, and so made that additional sections can be added from time to time, and that defendant is making and selling sectional bookcases in imitation not only of the system, but of such general features, with intent to deceive the public into the belief that they are complainant's goods. It being open to the public to make and use bookcases having such characteristics, it is equally open to any one to make them for sale and to put them on the market.

Appeal from the Circuit Court of the United States for the Western District of Michigan.

This is a controversy between rival manufacturers of sectional bookcases. The bill, which was filed by the appellant, presents a case having a twofold aspect, complaining that the appellee is manufacturing and selling sectional bookcases which infringe patent No. 557,737, granted to Wernicke, April 7, 1896, which the appellant owns by assignment; and complaining also that the appellee is guilty of unfair competition in its business by manufacturing and selling sectional bookcases purposely made to resemble those which are being made and sold by the appellant under its said patent, to such an extent that they may be, and are, mistaken by the trade for those of the appellant and purchased as such. So much of the matter of the bill as relates to the infringement of the patent was heard and decided upon pleadings and proofs. That part which complains of unfair competition was heard and decided upon the bill and a demurrer reaching to the merits. The bill was dismissed in respect to both grounds for relief.

¶ 1. Unfair competition, see notes to Scheuer v. Muller, 20 C. C. A. 165; Laro v. Harper & Bros., 30 C. C. A. 376.

A. C. Denison and Robert H. Parkinson, for appellant.
Fred L. Chappell, for appellee.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

SEVERENS, Circuit Judge, having given the foregoing outline of the case, delivered the opinion of the court.

The patent No. 557,737, upon which the appellant relies, was granted to Wernicke for certain new and useful "improvements in sectional bookcases." The inventor states in his application that his invention relates to sectional bookcases of such construction that each section may be "collapsed" and shipped in a knock-down condition, and afterwa. is readily assembled by the person receiving the same, and also to a particular construction of the door, back, and other parts of the section, and the combination of the parts thereof, as described and claimed.

· The general plan of his bookcases consists in building cases for each row of books intended to be accommodated, separately, in the form of a long box opening at the front by a glass door hinged by a hook under the top of the case on a pin projecting in from the body of the case at each end, and normally hanging down and closing the case, but adapted to be turned outward and upward from the bottom and pushed back over the pivots through grooves on the inside of the case, to accommodate the removal and replacing of the books standing in the case. These doors have a strip of felt fastened to the inner edge of the top rail to close the opening and keep out the dust and air. The cases are of equal length and otherwise of such conformity that they may be piled one above the other, and the tiers placed end to end, and having interlocking dovetailed attachments at their ends, and having also two strips lengthwise on the bottom, and a corresponding single strip lengthwise of the top, adapted to fit between the two bottom strips of the next section above, by which they are secured together and made to present an even front. They could be piled as high or extended lengthwise to such extent as is desired. Metallic strips are fastened around the ends and front corners of the case at the bottom, extending downward so as to shut down outside of the top of the case below, on which strips the interlocking attachments above mentioned are fastened. Suitable bases and caps are provided, but they constitute no part of the invention.

Following the specification, 20 claims are appended, of which Nos. 12, 15, 16, 17, 18, 19, and 20 are alleged to be infringed. They are as follows:

"Claim 12. A bookcase comprising a series of separable sections placed one above the other, the ends of the longitudinally adjoining sections being provided with the strips, 24, having the ends, 25, and the alternate strips being provided with a dovetailed tenon, 26, to engage a similar shaped slot in the strip provided in the end of the abutting section, substantially as described."

"Claim 15. A bookcase comprising a series of sections, the ends of said sections being provided with the grooves, 42, and the shoulders, 40, the door arranged to slide upon the shoulders formed by said grooves, the pins, 44, the hooks, 43, for engaging the same, and said door being provided on its inner edge with the felt, 39, for the purpose set forth."

"Claim 16. A bookcase comprising a series of separable sections adapted to

be placed one above the other, the ends and top and bottom of each section being provided with interlocking devices adapted to engage corresponding devices in the ends, bottom, and top of the adjacent sections.

"Claim 17. A bookcase section having its bottom formed of the longitudinal strips, 2 and 3, and the plate, 4, arranged over said strips, in combination with a similar section having at its top a longitudinal strip, 8, adapted to fit into the space between said strips, 2 and 3, and below said plate, 4.

"Claim 18. A bookcase section having its bottom provided with the two strips, 2 and 3, and provided with finishing strips, 24, extending across the ends of the strips, 2 and 3.

"Claim 19. A bookcase section having its bottom provided with the two strips, 2 and 3, having a space between them to receive the top strip of a similar section, and the finishing strips, 24, extending across the ends of said strips, 2 and 3, and provided with means for interlocking with similar strips upon the ends of abutting sections.

"Claim 20. A bookcase section provided at the lower part of each end with a finishing strip extending from the front to the rear of the section, and having a projection or recess adapted to interlock with a corresponding recess or projection upon the end of an abutting section."

The following diagrams selected from the drawings sufficiently illustrate these claims:

The validity of these claims is denied upon the ground that they were anticipated, or, if not fully anticipated, they represent only the result of mere mechanical skill over similar constructions for various uses. Before taking up these claims separately, it will be convenient to ascertain what had already been done in that direction. Wernicke knew that previous constructions of sectional bookcases had been made, and that he did not suppose he was a pioneer; for he states, as we have seen, that his invention was of improvements in the construction of such cases, and he had himself, jointly with another, taken out a patent on such cases. Not all of the previous sectional cases were made for the purpose of housing books; but as they had been patented, and were adapted to be used for that purpose without material alteration, it will not, we presume, be contended that applying them, even with slight modifications, to this new use would constitute patentable invention. Doubtless the re-

sult would be otherwise if the changes necessary to adapt them to the new use were not obvious and required more than mere skill to devise them.

Before going into particulars, it will be convenient to take a more extensive survey of the condition of the art in the construction of these and similar manufactures. A patent (No. 220,163) for improvement in sectional bookcases was issued to W. J. Marble, September 30, 1879, and shows sectional cases of the same general form as those of Wernicke, and having the same strips lengthwise of the bottom and top. They were intended to be put on top of one another, and to have a door adapted to be readily removed, or a curtain rolling up in front, as might be preferred. It did not have the separate door for each section, as in the Wernicke patent, nor did it suggest continuation of the bookcase by adding other tiers at the end. But a still earlier patent (No. 181,447), to Keys and Taylor, in 1876, showed a combination of a writing desk and a bookcase in sections one above the other, each inclosure having a door in front adapted to swing open and then slide in over the section so as to leave the front open and the door out of the way. The attachments by which this movement of the door was effected are not shown, but seem to have been left to the ingenuity or skill of the builder. On March 7, 1893, a patent was granted to Watts (No. 492,909) for an invention the substance of which was a front door for a refrigerator, and so constructed as to open on hinges above, and then slide back over the provision chamber. The hinges were made in precisely the same way as those in the Wernicke patent; that is to say, they consisted of a hook on the door turning over a pin projecting in from the frame. Moreover, the door, when thus pulled open and raised to a horizontal position, was pushed in, sliding on "guide-cleats." A patent to Berners in 1890 was for the invention of a door or analogous device, in which the door was lifted up and then pushed backward on pins or rollers projecting at the edges of the door, and sliding in grooves inside the case. A patent to Kroenke (1886) shows a refrigerator door adjusted so as to swing forward from the bottom, and be raised to a horizontal or nearly horizontal position, and then pushed back on guide grooves in the edges, moving on pins projecting inwardly from the casing. In the same year a patent was issued to Lee for a showcase having a glass door in front sliding outward and upward, and then pushed back upon pins projecting from the edges, sliding in "seats" (grooves) on the inner side of the frame. Another patent to Wernicke and Burr for sectional bookcases will be mentioned further on.

From these and other structures illustrated by patents shown in the record, we are satisfied that it was a well-known method of attaching and using a door for similar structures to hinge it at the top by a pin or other form of pivot over which the door was raised and pushed back, sometimes in guides on the inside of the case, or sometimes with the pin or grooves on the opposite members. It further appears that such devices had been employed in this particular art, and, as we have seen in one form of patented structure, the very form of hinge and groove employed by Wernicke was shown.

Sectional bookcases put up one on top of the other, and constructed in the same manner at the top and bottom as those in the Wernicke patent, to hold them in vertical alignment, had been made and patented many years before. We reserve the discussion of minor features for consideration in dealing with the particular claims in controversy.

Claim 12 contemplates a bookcase made up of sections placed in tiers one above the other and of tiers of sections placed end to end; metallic ends coming around the front corners; a dovetailed tenon on each alternate strip to engage with a corresponding slot on the end strip of the adjacent section. Of course, there is nothing in placing the sections one above the other, or the tiers of sections end to end, which is a mere duplication, and, indeed, was not new. The substance of the claim, therefore, consists in the employment of the metallic strip and the dovetailed joint. The principal purposes of the strip are to cover the division or joint between two sections, and thereby improve the appearance, also to aid in holding the sections in alignment. In the Wernicke & Burr application of 1894 a like strip called a "suitable ornamental molding" is provided to conceal the ends of the slats on the bottom of the crates. It is not stated of what material the molding should be made. It might be either of wood or metal, and in either case it would serve the same purpose of effecting an alignment of the sections as that mentioned in this claim of the Wernicke patent. There was nothing amounting to invention in extending this strip around the front corner for the same purpose. This strip is in legal contemplation the same thing as that on the Wernicke & Burr bookcase. Other similar devices for the same purpose are shown in the evidence of the prior art. The dovetailed tenon attachment for locking the ends together had also been previously used for the same or kindred purposes, and was found in previous patents. In 1886 N. H. Pohl obtained a patent for locking bookcases together by this method. In a patent to Spruce, issued in 1880, this form of construction was used to attach the ends of postoffice boxes together. The whole subject of that patent was the attaching together in a mass several boxes by a dovetailed fastening. It is needless to pursue this matter by referring to other similar forms shown by the record, because the appellee does not use that mode of connection. Its method consists of using projections on the ends of the sections and perpendicular thereto, in contact so as to keep the faces of the tiers of sections in alignment. They do not hold the ends of the sections together laterally. And it is clear enough that these projections are not only unlike the dovetailed tenon and its mate, but they do not effect the same results.

Claim 15 is as follows:

"A bookcase comprising a series of sections, the end of said sections being provided with the grooves, 42, and the shoulders, 40, the door arranged to slide upon the shoulders formed by said grooves, the pins, 44, the hooks, 43, for engaging the same, and said door being provided on its inner edge with the felt, 39, for the purpose set forth."

40 is the shoulder against which the frame of the door rests. It is simply a stop for the door, and is common in the ordinary construction of door and window frames. The hook and pin was an old form of constructing an open joint, and was used as we have shown in the Watts patent. The duplication of the sections by imposing one upon the other and setting the tiers end to end was not new, supposing it to have ever been patentable as an invention. The attachment of the felt strip on the inner edge of the door is all that remains of this claim for consideration.

Felt strips on the edges of windows and doors to keep out air are old, as every one knows. But complainant and its experts think that the strip makes the door tighter, and that this produces the effect of a bellows to blow the dust out when the door is opened and shut. Possibly it has such an effect. If it does, it is the same effect and is of the same advantage as the same attachment on any other door. But the patentee attaches this strip to the inside of the upper edge of the door, and this is the call of the claim. He has thus restricted himself to that construction. The appellee uses a felt strip, but attaches it to the outer edge of the door. Seeing that similar uses of such strips attached in similar ways were old and common, and having regard also to the specific character of the claim, we think there is no infringement, even if this added feature made the claim patentable.

Claim 16 reads as follows:

"A bookcase comprising a series of separable sections adapted to be placed one above the other, the ends, top, and bottom of each section being provided with interlocking devices adapted to engage corresponding devices in the ends, bottom, and top of the adjacent sections."

This is a combination of features which we have already discussed, and we see no occasion to consider it further. All the elements were old, even in bookcases.

Claim 17 is this:

"A bookcase section, having its bottom formed of the longitudinal strips, 2 and 3, and the plate, 4, arranged over said strips, in combination with a similar section having at its top a longitudinal strip, 8, adapted to fit into the space between said strips, 2 and 3, and below said plate, 4."

It adds to the elementary form of the section a plate (or veneer) to the bottom on the inside. It is secured to the bottom slats and becomes integral with them. It comes to the same thing as if the opening below had been made more shallow, not extending through the bottom, and the top slat in the section below thinner, which would be but a slight variation only from the earlier forms. The object of this plate was doubtless to prevent the abrasion of the lower edges of the books when they were being put into or removed from the case. If there was a need of this, as we can well suppose if the slat from below extended through the bottom, can it be regarded as invention to put this veneering in to make a smooth bottom? It seems to us so obvious a remedy that it need not long delay an ordinary workman to devise it, and that it would be absurd to elevate the adoption of such a common expedient to the dignity of invention.

Claim 18 is as follows:

"A bookcase section having its bottom provided with the two strips, 2 and 3, and provided with finishing strips, 24, extending across the ends of the strips, 2 and 3."

This counts in the two bottom slats and the finishing strip. As we have already seen, a finishing strip adapted to the same purposes was shown in the Wernicke & Burr patent for a "separable bookcase." The choosing of a particular kind of strip and the substitution of metal for wood are only matters of taste or of ordinary judgment.

Claim 19 is as follows:

"A bookcase section having its bottom provided with the strips, 2 and 3, having a space between them to receive the top strip of a similar section, and the finishing strips, 24, extending across the ends of said strips, 2 and 3, and provided with means for interlocking with similar strips upon the ends of abutting section."

The only peculiar feature in this claim is the location of the interlocking devices upon the finishing strips. It is suggested that this, although it does not increase the effectiveness of the interlocking beyond what would be done by locating the interlocking device upon some part of the end of the case itself, yet it avoids the marring of the ends and is neater. If this is an advantage, it was very obvious how it could be attained. But it is clear from Wernicke's specification that what he intends by "means for interlocking" is the dovetailed tenon and its counterpart, for he nowhere suggests any other mode of lateral connection of his sections. The appellee does not, however, use that device, as has already been stated, and, as it is made an essential element in the claim we are discussing, there is no infringement if the claim were to be held valid.

Claim 20 is this:

"A bookcase section provided at the lower part of each end with a finishing strip extending from the front to the rear of the section, and having a projection or recess adapted to interlock with a corresponding recess or projection upon the end of an abutting section."

This claim excludes everything else but the finishing strips and the interlocking projections thereon. What we have already said with reference to claim 19 is applicable to claim 20. It is obvious that the interlocking means intended must be such as shall prevent the sections in the tiers from spreading apart laterally, and whatever the merits of the claim may be we think the appellee does not infringe it.

And finally, after a full and careful consideration of the patent upon which the appellant relies, we feel constrained to the conclusion that it exhibits nothing more than a judicious selection of well-known devices, obvious to their purposes, and putting them into the construction of bookcases, and that there was nothing of the quality of invention in any part thereof. Given the idea of sectional bookcases, the imposition of one upon another, and the lateral extension thereof by duplication of the tiers, all the expedients employed in carrying out that idea are borrowed and not invented. And the things borrowed were close at hand and had already been disclosed.

The fact (for we believe it to be the fact) that these bookcases

have gone into extensive use is due, as we think, to the elegant workmanship employed in their manufacture, and the convenience of having the sections separable, aided by the energy with which, as the bill states, they were pressed upon the market.

In the other aspect of the bill, the relief was prayed for the unfair competition in business therein alleged. It appears that a demurrer to that portion of the bill was sustained. Later on, and after six months had elapsed, an amendment of the bill in that regard was allowed against the objection of the appellee. The bill as thus amended was demurred to, and the demurrer was sustained upon the final hearing of the case, when the bill was dismissed. It is pressed upon us by the appellee that as no action had been taken after the first order of dismissal, and the six months allowed by law for an appeal had expired, it was beyond the power of the court to allow an appeal. But this contention is founded upon a misapprehension in respect to the finality of the first order. The bill was not founded upon two separate matters or transactions. The conduct of the appellee complained of consisted of the same acts. The legal qualities of those acts were in some respects different, and the result was that the facts presented a double aspect. It is upon this consideration that such a bill can be sustained against an objection that it is multifarious. Upon such a bill as this, successive final decrees are not pronounced. Interlocutory orders may be entered, which have the effect of disposing of some of the matters of the bill for the time being, and the case proceeds until all the matters are decided, whereupon a final decree is entered. Meantime the court does not lose control of the questions decided in the preliminary or interlocutory orders, but may revise them, if it finds sufficient reason, in rendering the final decree. We have no doubt that the allowance of the amendment was within the power of the court and subject to its discretion. Moreover, we see no reason to think its discretion was wrongfully exercised.

Upon the merits of this aspect of the case, we are of opinion that the decree of the circuit court was right. The foundation of this claim of the appellant is that upon the footing of the Wernicke patent it and its predecessors in the business have built up a large business in the manufacture and sale of bookcases intended to conform to the system of such patent; that they have made them in sectional crates in such mode that the bookcases which they compose may be built of any height or any length, or be put in any desired form of arrangement; that their sections, or "units," as they are termed, are made of "different sizes, so that large or small could be had as desired"; that they were built of a variety of woods, of different styles and finish, so that the purchaser could choose, within limits which are not stated, any style, material, or finish he might desire. And it is alleged that at great expense they built up a large trade in such bookcases, not only in originally supplying them, but in selling additions made in the different sizes, styles, materials, and finish of the originals, so that they would harmoniously fit into the original structures. There is considerable amplification, but that is the substance. The complaint is that the appellee is making and selling sectional bookcases in imitation, not only of the "system" which the appellant employs, but also

of the sizes, styles, material, and finish of those of the appellant, and this imitation is done with the intent to deceive the public and induce purchasers to buy their goods of the appellee. It is not alleged that the defendant represents to the public that its bookcases are of the complainant's manufacture, but only that it makes bookcases and sections in the same sizes, styles, varieties of wood, and finish as the complainant's, and that by reason thereof the public are misled. The intention is not material, if the defendant has the right to do that which is complained of. On the other hand, if the thing done is wrongful, the lack of intention would not excuse. In either case, the motive is immaterial to any question involved in the present inquiry. 2 Greenl. Ev. § 270; Chatfield v. Wilson, 28 Vt. 49; Heath v. Unwin, 15 Sim. 552 (per Vice Chancellor Shadwell); Stead v. Anderson, 4 C. B. 806; Parker v. Hulme, 1 Fish. Pat. Cas. 44, Fed. Cas. No. 10,740. It is impossible to admit the claim of the appellant to the extent of its pretensions, which would amount to a monopoly of such proportions as would practically engross the business. Without doubt, a party may adopt distinguishing marks to denote the origin of production as being his own, or he may adopt some other peculiar method of distinguishing his own goods, and thus retain the benefit of the good reputation which he has acquired for them. But the very idea of distinguishing them implies that it cannot be done by such universal characteristics as belong to other goods of the kind, and which the general public have the undoubted right to use. Thus, the public have the right to make bookcases of any size. From the nature of the requirements they must have resemblance in form, dimensions, and appearance. So no one can have the exclusive privilege of locating them in sections one above another or end to end, nor in making them of any kind of wood or metal as he chooses, nor in the style or in the finish of his work, unless it is peculiar and out of the ordinary. Upon the claim made for the appellant, it would be impossible, without invading complainant's right, to construct and sell a bookcase having the most desirable characteristics. Nor is it competent for one person to appropriate to his own purposes any common and general characteristics of the goods he manufactures to such an extent that another shall be impleaded or embarrassed in his free right to use such characteristics in his own business. In the present case, the complainant does not rest upon the adoption of special characteristics of any kind, but upon the use of the common features which pertain to the article made and sold.

A grievance of which much complaint is made is that, in consequence of the resemblance of the defendant's sections to the complainant's, the public are led to buy the defendant's sections for the purpose of extending the bookcases they have already purchased of the complainant's manufacture. But, unless the complainant has in some way obtained a monopoly of building bookcases in this way, it can have no valid objection to the defendant supplying such additions to bookcases already sold by the complainant.

The decree of the circuit court is affirmed.