## S. S. KRESGE CO. v. CHAMPION SPARK PLUG CO. (two cases).

## CHAMPION SPARK PLUG CO. v. S. S. KRESGE CO.

(Circuit Court of Appeals, Sixth Circuit. January 10, 1925.)

Nos. 4065, 4070, 4071.

**1. Patents ⊙⇒328 — Stranahan patent, No. 1,180,759, for spark plug, held valid and infringed.**

The Stranahan patent, No. 1,180,799, claims 1, 3, and 6, for spark plugs for internal combustion engines, *held* not anticipated, and valid as limited; also *held* infringed.

**2. Trade-marks and trade-names and unfair competition ⊙⇒68—"Standard" spark plug and core held to imply those used in factory equipment.**

The word "Standard" as used on cartons containing spark plugs and cores, having printed thereon the words "Standard spark plug for Fords" and "Standard spark plug core for Fords," *held* to imply to purchasers for replacement purposes that the spark plugs and cores contained therein were those used in factory equipment of the Ford cars, on evidence that other items of such equipment were advertised as "standard" to indicate that fact, and that such had come to be the general understanding of the meaning of the word when used in that connection.

**3. Trade-marks and trade-names and unfair competition ⊙⇒69—Fraudulent intent may color meaning of words used.**

An underlying intent to perpetrate a fraud on consumers must color the accompanying acts, and may be taken into account in determining the sense in which words used would naturally be interpreted, and were expected to be interpreted.

**4. Trade-marks and trade-names and unfair competition ⊙⇒75—Evidence of actual deception not essential to unfair competition.**

The primary purpose of evidence of actual deception is to show tendency or likelihood to deceive, and the manufacturer of a counterfeit article will be enjoined from selling it, even though his immediate purchaser is not deceived, if the sale is made with the expectation that it is to be used by dealers to deceive consumers.

**5. Trade-marks and trade-names and unfair competition ⊙⇒98—Profits may be recoverable for unfair competition.**

On an interlocutory decree for complainant for unfair competition, the normal order is for an accounting as to both profits and damages, and the fact that thus far there has been no proof of actual sales of defendant's goods as those of complainant is not conclusive against recovery.

**6. Monopolies ⊙⇒17(2) — Discrimination in price to different purchasers not unlawful, unless it lessens competition or tends to create a monopoly.**

Clayton Act, § 2 (Comp. St. § 8835b), prohibiting discrimination in price between different purchasers of a commodity, forbids such discrimination only where the effect may be to unreasonably lessen competition, or tend to create a monopoly.

**7. Monopolies ⊙⇒17(2) — Discrimination in prices held not in violation of Clayton Act.**

What the manufacturer of an automobile equipment part sold it in large quantities for factory equipment of cars at less than cost, expected to be made up by replacement sales at a higher price, *held* not in violation of Clayton Act, § 2 (Comp. St. § 8835b), where replacement sales were in open competition with other manufacturers.

Appeals and Cross-Appeal from the District Court of the United States for the Northern District of Ohio; D. C. Westenhaver, Judge.

Suit in equity by the Champion Spark Plug Company against the S. S. Kresge Company. Defendant appeals from an interlocutory decree, and cross-appeals from supplementary order granting and limiting injunction. Affirmed.

Henry M. Huxley, of Chicago, Ill. (George L. Wilkinson, of Chicago, Ill., on the brief), for S. S. Kresge Co.

Wilber Owen, of Toledo, Ohio (A. C. Paul, of Minneapolis, Minn., on the brief), for Champion Spark Plug Co.

Before DENISON, DONAHUE, and KNAPPEN, Circuit Judges.

KNAPPEN, Circuit Judge. This suit is for infringement of claims 1, 3, and 6 of patent No. 1,180,799, April 25, 1916, to Stranahan, assignor to plaintiff, on spark plugs for internal combustion engines, and for alleged unfair competition in the sale of plugs and cores in imitation of the design, form, dress, and appearance of plaintiff's plugs.

The Champion Spark Plug Company, hereinafter called plaintiff, is, and for many years has been, manufacturing spark plugs under contract with the Ford Company, for use in the manufacture of Ford automobiles, and latterly in tractors as well; also in selling plugs and porcelains to a large public renewal trade. S. S. Kresge Company, hereinafter called defendant, is the proprietor of a line of 5 and 10 cent stores, which made sales, alleged to constitute unfair competition, of plugs and porcelains bought from the manufacturer thereof, the Myles-Standish Manufacturing Company, which conducted the defense herein. Defendant denies validity of patent, infringement, and unfair competition.

The interlocutory decree found the claims in suit valid and infringed, and sustained the charge of unfair competition in the marketing of plugs and porcelains contained in cartons bearing legends such as "Standard spark plug for Fords," "Ford Plugs," "Ford Core," and "Manufactured expressly for use in the Ford engine," which markings were held to effect a palming off on the public of defendant's wares as plugs and cores of plaintiff's manufacture. There were appropriate orders for injunction and accounting.

No. 4065 is defendant's appeal from both branches of the interlocutory decree. Later defendant presented to the District Court three exhibits, and asked determination whether their sale (respectively) would infringe the patent or violate the injunction against unfair competition. No 4070 is plaintiff's appeal from the order denying injunction against the sale of certain cores without any inclosing cartons, as well as the sale of such cores in cartons bearing the legend "Not made by the Champion Spark Plug Company, nor supplied as Ford factory equipment." No. 4071 is defendant's appeal from so much of the order as enjoined the sale of such cores in cartons which, while correctly giving the name and address of the manufacturer, bore the words "Universal spark plug core for Fords."

Previous to the commencement of this suit plaintiff had brought suit in the United States District Court for the District of Nebraska against the Myles-Standish Company for infringement of the same claims of the Stranahan patent as involved here, as well as for unfair competition, based on substantially the same grounds as are before us. The District Court found the claims valid and infringed, and sustained the charge of unfair competition. The United States Circuit Court of Appeals for the Eighth Circuit affirmed generally the decree of the District Court. 282 F. 961. The record in the Standish Case is made part of the record in the instant case.

[1] *Patent Infringement.*—The office of a spark plug is to furnish intermittently a spark which shall explode the charge of gas in the cylinder, so directly creating the motive power. In the type here involved, the plug consists of a two-part metal shell inclosing a "core," which consists of an electrode in its protecting insulating member, commonly called a porcelain, and which

here is that substance. The two parts of the shell screw together, thus holding the core firmly in position. The lower section screws into an opening therefor in the casing of the engine cylinder. In order to insure perfect insulation of the electrode, there must be gas-tight connection between shell and core, and a perfect centering of the core in the shell is essential to the maintaining of a proper spacing of the spark-producing electrodes in core and shell, respectively. The stated objects of the invention are to provide means for producing these results, and without injury to the porcelain.

The patent specification shows an annular enlargement of the porcelain intermediate its ends, and forming a projecting seat which fits into a depression in the inner wall of the lower section of the shell. A sheet-metal gasket, having a tapered shoulder, conforms to and fits over the upper porcelain shoulder, and receives the thrust of the follower nut, which forms the upper section of the shell. The lower sheet-metal ring-shaped gasket is seated on and receives the thrust from the lower porcelain shoulder. The outer edge of the lower gasket is turned upward to provide an upstanding flange encircling the base portion of the lower porcelain shoulder. The upper gasket has, extending downwardly from its tapered shoulder portion, a skirt portion which surrounds the upper end portion of the porcelain enlargement, and upwardly from the upper edge of the skirt portion a contracted portion fitting more or less closely around the porcelain and above the shoulder, its upper edge (preferably contracted) coacting with the porcelain and centering thereon in spaced relation thereto; the gaskets being maintained in centered relation to the shell through the fitting of their adjacent flanges against the wall of the shell opening. Each of the gaskets incloses a cushion of asbestos, or other suitable material, to aid in making a tight connection between the porcelain and the shell.

The general type of plaintiff's removable core plug was old, as was the use of gaskets of some form to make gas-tight connection between shell and core. The novel element of the combination claims in suit relates to the form of the upper gasket, which was designed to aid in effecting core-centering and (indirectly) gas-tight connection, which latter function is performed principally by the lower gasket.

The defense of invalidity of patent embraces anticipation and lack of novelty. The claims in suit are printed in the margin.[1] The defense of anticipation is based, principally, at least, upon the patent to Gates, No. 1,141,052, May 29, 1915, which patent antedates Stranahan. It was not discovered by the defendants until after the decision of the Circuit Court of Appeals of the Eighth Circuit, and that court denied leave to file supplemental bill to review its decision on grounds including the discovery of the Gates patent. The reason for this refusal does not appear.

We are not convinced that this reference establishes anticipation. It calls for a "ring packing" between the follower nut and porcelain shoulder, upwardly extending flanges on the packing strip separated by a V-shape groove, one of which flanges is forced by the nut's action "outwardly against the base [shell]," the other inwardly against the porcelain, thereby "sealing the porcelain in the base." It calls also for a "lower flange" of the "packing" (below the porcelain shoulder) which is by the nut's action expanded into contact with the shell. The invention "particularly relates to the packing for sealing the porcelain to the base." The inventor's only thought seems to have been to provide a construction "free from leakage"; the idea of thereby centering the porcelain seems not to have occurred to him.

It does not appear that Gates' plug was ever manufactured and sold commercially; its method of operation differed from that of Stranahan; it seems to have been more distinctively a mere packing. It is at least seriously doubtful whether it was practical as a sealing device, or that it would perform the function of the Stranahan gasket in assisting to center the porcelain, especially in connection with the assembling of the parts in quantity production. There is substantial testimony to the effect that the action of the nut would tend to so crush the packing as to interfere with, if not prevent, the removal of the porcelain from the shell, and thus impair the advantage of renewability of porcelains. None of the other references in the prior art amount to anticipation, nor do we think they exclude inventive novelty in the claims in suit. At the nearest, the prior art discloses beveled or tapered porcelain shoulders fitting into seats in the shells, with gaskets at the place of contact, which tend to effect insulation and gas-tight connection, and no doubt had some tendency to assist in centering the porcelain. But we think none of the disclosures have the Stranahan upper gasket, which, we are convinced, contributes in that direction much more effectively than the gaskets of the prior art. Indeed, there is apparently reliable testimony that the Stranahan device has reduced the proportion of imperfect centering from a former 25 per cent. down to 2 per cent. in assembling in the course of rapid quantity production.

While the claims are narrow, we think that, as limited, they are valid. Utility sufficiently appears, not only from the fact of defendant's adoption of the Stranahan device, but from the testimony just alluded to.

We have no difficulty in finding infringement. Defendant's structure, including the upper gasket, is in all essential respects that of the claims in suit. We find nothing in the Patent Office history, which is fully set forth in the opinion of the Circuit Court of Appeals of the Eighth Circuit, or in the prior art, which we think injects into the claims in suit, as an element, the contracted portion extending upwardly from the upper edge of the skirt portion of the outer gasket. Nor are we impressed that utility is due alone to that feature. In view of what has been already said, the fact that defendant's lower gasket lacks the upstanding flange encircling the base of the lower

---

[1] "1. The combination with the insulating electrode carrying core and the core carrying shell of a spark plug, said core and shell having co-operating shoulders and being relatively spaced one from the other of a gasket having an annular transversely projecting seat portion for coaction with said shoulder, and having end portions projected in opposite directions substantially lengthwise of the gasket axis from the inner and outer edges of said seat portion, with one end portion fitting the core and the other end portion fitting the shell bore."

"3. The combination with the shell and porcelain of a spark plug, of a gasket having one end portion in centering contact with the shell and its other end portion in centering contact with the porcelain and having a portion intermediate said end portions which is gripped between respective portions of the shell and porcelain."

"6. The combination with the shell and porcelain of a spark plug, of a gasket having one edge portion restricted with respect to the shell and in centering engagement with the porcelain and its other edge portion enlarged relative to the porcelain and in centering engagement with the shell and having an intermediate part gripped between the shell and porcelain."

3 F.(2d)—27

porcelain shoulder does not prevent infringement.

[2] 2. *Unfair Competition.*—In February, 1911, plaintiff began manufacturing spark plugs for Ford car factory equipment, and has since furnished nearly the entire of such spark plug equipment. To secure the contract for the sake of replacement business at a profit, plaintiff made to the Ford Motor Company a price which covered only the materials and direct labor, such price being at first about 5 cents, and—as cost of production increased—finally about 10 cents per plug below total factory cost, and at once began a campaign to reach the replacement trade, by advertising its Champion X plugs as Ford factory equipment through newspapers, trade journals, advertising cards, and window dressings. In 1911 plaintiff had Ford orders for about 200,000 plugs, which orders increased from year to year until in 1919, when the Standish Company's competition began, it was selling the Ford Company annually about 3,500,000 plugs. It took until some time in 1915 for the replacement sales to equal the factory equipment sales. Plaintiff's expenses, meanwhile, for advertising its plug and the fact that it was Ford factory equipment, plus the loss on factory equipment sales, amounted to much more than $1,000,000. Plaintiff has not sold the "Champion X" plug as factory equipment on any other car than the Ford. There is satisfactory evidence tending to show that the term "Standard for Fords," when applied to a spark plug, had come to mean the standard spark plug equipment at the Ford factory. Meanwhile the Ford factory had been inserting in its "Ford Manual," a copy of which was placed by the factory in each car before it was sent out, a recommendation that the owner use for replacement the plug furnished as factory equipment.[2]

About January 1, 1915, after defendant had manufactured other plugs, apparently not profitably, it conceived the idea of duplicating plaintiff's Champion X plug and core, with knowledge that the plugs and cores were Ford equipment, and that plaintiff had extensively advertised them as such—obtaining for the purpose several Cham-

pion X plugs, whose dimensions were carefully measured. We quote in the margin from the testimony of Mr. Standish, on direct examination by defendant's counsel, as contained in the record of the Standish case.[3] On cross-examination he asked that the report of his testimony be corrected, saying, as quoted in the margin.[4] It further appeared that his plugs and cores so copied from the Champion X plug and core (except that on the core a trade-mark in the form of a horseshoe was substituted for plaintiff's trade-mark "Champion X") were marketed by the Standish Company substantially, at least, without the necessity of advertising. After its plugs and cores (which apparently cost less to manufacture than plaintiff's) were put into syndicate and 10-cent stores (where they retailed at prices much less than plaintiff's), business came so fast that the Standish Company had "hard work to take care of it." Eighty-five per cent. of the Standish Company's sales were cores, separately from the plugs.

On the Standish cartons, which naturally were practically, if not exactly, of the same dimensions as plaintiff's, were prominently printed one or more of the legends previously referred to herein—one form of plug containing on its sides respectively, "Spark plug for the Ford;" a cut of spark plug; "One-half inch standard spark plug for

---

[2] "There is nothing to be gained by experimenting with different makes of plugs. The make of plugs with which Ford engines are equipped when they leave the factory are best adapted to the requirements of our motor, notwithstanding the opinion of various garage men to the contrary."

[3] "We concluded that, in order to meet the situation for a much-needed spark plug, we would adopt the kind of a spark plug that was used in the Ford cars, using that as a model to go by, not that that was the Champion X spark plug, or because it was made by any particular company, but because 'it came in the Ford car, we felt that we could say, 'That is the kind of spark plug you want, because it is the kind that came in the Ford car when you bought it,' or something to that effect. And we said we will start and standardize our plug business along this line, and by that I mean use the same specifications as are used in the Ford car, as near as we could determine what they were.'"

[4] "My testimony should have been that we, in order to meet the situation as we saw it, that is, the situation of standardization and general thought along those lines, that we would build a plug along the standards of the Ford Motor Company rather than along some of our own peculiar ideas, and merchandise it without any comparison, except to say: Here is the same kind of plug that Henry Ford uses. We make them because he uses that kind. We don't care whether it is the best plug for the Ford motor, or the poorest plug for the Ford motor. We won't take a stand on that point; we merely intend to duplicate the equipment that comes in the Ford car as far as the general dimensions go."

Fords;" "Manufactured expressly for use in the Ford engine by Myles-Standish Manufacturing Company, Nebraska, U. S. A.;" on one end, "For Fords;" on the other end, "½-inch standard." The marks on the sides of one of the Standish core cartons were, respectively, "Standard Spark Plug Core for Fords," accompanied by a representation of the core; this was repeated on a second side; on the third side a cut of the core; and on the fourth the same statement of manufacturing origin as in the case of the plug cartons described; on each of the ends of this core carton were the words "Ford core." While none of these cartons were of the identical color used by plaintiff (red), and while some were of an entirely different color, the two described were of an orange color.

On their face these acts would seem—on familiar principles—plainly to spell unfair competition, for we cannot accept defendant's contention that the word "standard," as used on these cartons, is merely descriptive, and so does not mean standard or factory Ford equipment. It is true that a one-half inch thread is a standard size thread, and that "standard" is also sometimes used to indicate the more common short plug, as distinguished from a long or extension plug, which carries the electrode lower down into the engine cylinder, and it may be that, if such words as "one-half inch standard spark plugs for Fords" stood alone, the charge of piracy might fail. But those words do not stand alone, and we cannot escape the conviction that the legends "spark plugs for Ford," "for Fords," "standard spark plug core for Fords," were calculated to and naturally did give the understanding that the plugs and cores were factory equipment. The record shows that the words "Standard equipped" and "Standard equipment" were used in advertisements by manufacturers of snubbers, gears, transmissions, lighting systems, reverse gears, and other things to indicate factory equipment. We think this would be the natural interpretation.

[3] Defendant insists that its intention is not material. True, if defendant had the right to do what it actually did, its evil motive would not create an action against it, and, if it had not such right, a good intention would not excuse. Globe-Wernicke Co. v Macey Co. (C. C. A. 6) 119 F. 696, 704, 56 C. C. A. 304. But it does not follow that a deliberate intention to pirate may not be taken into account in determining the sense in which the words used would naturally be interpreted—the sense in which they were expected to be interpreted. "When we find as a fact, from the other conduct of the defendant, that the underlying intent is to perpetrate a fraud upon the consumer, this intent must color the accompanying acts, and some which otherwise might be innocent become guilty." Coco-Cola Co. v. Gay-Ola Co. (C. C. A. 6) 200 F. 720, 723, 119 C. C. A. 164, 167.

We scarcely need say that, if the cartons are otherwise calculated to create the impression that defendant's plugs and cores are Ford factory equipment, the use of defendant's name thereon cuts little figure, so far as concerns the Ford owner, whose original plug and core came installed in the car and not in cartons, and who may well not have known the actual name of the plug, much less than that of the manufacturer, which, so far as shown by the record, was not given in the Ford manual.

[4] We are not impressed by the objection of lack of evidence that any one has been misled by defendant's acts. The primary purpose of evidence of actual deception is to show tendency or likelihood to deceive. That office is, we think, performed by the evidence of the furnishing to plaintiff's representatives, at numerous sales places in different cities (including 10-cent stores) of defendant's plugs or cores in response to requests for the Champion X plug or core, or a standard Ford plug or core—frequently with express assurance on the part of the seller of the genuineness of the article so sold. The fact that the purchaser under such circumstances was not deceived has no tendency to indicate that such would not have been the effect upon the ordinary and casual buyer, who is to be reckoned with. Samson Cordage Works v. Puritan Cordage Mills (C. C. A. 6) 211 F. 603, 610, 128 C. C. A. 203, L. R. A. 1915F, 1107. Indeed, the manufacturer of a counterfeit article will be enjoined from selling it even though his immediate purchaser be not deceived, if the sale be made with the expectation that it was to be used by the dealers to deceive consumers. Coco-Cola Co. v. Gay Ola Co., supra, pages 720, 723.

Nor do we think the charge of unfair competition affected by the fact that since about January, 1922—and thus since the institution of the instant suit—plaintiff has supplied as factory equipment, for both Ford cars and Ford tractors, an extension plug called "Champion Ford," instead of

"Champion X," and which plug, except as to length, is the same plug as "Champion X."[5] Not only is the original or short length Champion X still standard factory equipment for cars built before the extension form was adopted, but the name Champion X is still used on Champion plugs sold by plaintiff to others than Ford, whether short form or long form; both forms being advertised as standard Ford equipment.

[5] Nor do we think it important that during a portion of the year 1921 the Ford Company bought from the Bethlehem Company about half a million spark plugs. The Champion plug made by plaintiff did not thereby cease to be standard Ford equipment. Not only has it apparently ever since been exclusively such standard equipment, but even during 1921 plaintiff furnished the Ford Company therefor about 2,500,000 Champion X plugs. We see no occasion to interfere with the provision for accounting as to both profits and damages. Such would be the normal order. I. T. S. Rubber Co. v. Tee Pee Rubber Co. (C. C. A. 6) 288 F. 794, 798. And it is by no means clear that plaintiff may not prove entitled to substantial recovery. Lack of proof thus far that sales have been made to purchasers who thought they were buying plaintiff's goods is not conclusive against recovery, especially in view of what we have already said on that subject.

[6, 7] Defendant contends, however, that plaintiff comes into equity with unclean hands, in that its sales of plugs for factory equipment at less than cost—to be compensated for by increased prices for replacements—violates the Clayton Act (38 Stat. 730, Act Oct. 15, 1914, c. 323, § 2 [Comp. St. § 8835b]). That act—rightly interpreted—forbids discrimination in price between purchasers only where the effect may be unreasonably to lessen competition or tend to create a monopoly, which we think is not shown to be the case here. The price of the car to the original purchasers is presumably lessened by the low prices paid for factory equipment. The replacement price is not necessarily thereby increased above the normal from the mere fact that the loss incurred in providing factory equipment must be overcome by replacement prices. The field is open to all fair competitors.

[5] The form of the porcelain of the extension plug is the same as that of the earlier short plug, except that it has two circumferential ribs near its upper end and is marked "Champion Ford," instead of "Champion X."

No doubt the immense quantities of plugs which plaintiff has been able to supply as factory equipment, has enabled it to manufacture and market at much less cost than it otherwise could. The furnishing of factory equipment at less than cost seems to present a not unfair analogy to cost of advertising.

The Circuit Court of Appeals of the Eighth Circuit made no reference to this defense. In our opinion the decisions in the gasoline and acetylene tank cases furnish some degree of analogy. Canfield Oil Co. v. Federal Trade Commission (C. C. A. 6) 274 F. 571; Auto Acetylene Light Co. v. Prest-O-Lite Co. (C. C. A. 6) 264 F. 810; Id. (C. C. A.) 276 F. 537; Standard Oil Co. v. Federal Trade Commission (C. C. A. 3) 282 F. 81. Apart from the effect of the provisos in the second section of the Clayton Act, and whether or not a violation thereof would defeat action for unfair competition, we think the Act does not apply here.

The decree of the District Court in No. 4065 is accordingly affirmed, with costs.

### The Supplemental Record.

In No. 4070 Judge Westenhaver did not pass upon the question whether or not the sale of cores like Defendant's Exhibit X, without inclosing cartons, would violate the injunction against unfair competition, but made the order denying injunction with permission to plaintiff, at its option, to institute supplemental proceedings for unfair competition, if defendant should sell such plug cores without inclosing cartons.

We are disposed to think such sales not unfair competition, in view of the fact that defendant is at liberty to make cores like plaintiff's, so long as nothing is done to palm them off as plaintiff's manufacture, or as standard Ford factory equipment, in connection with a presumption that an owner's familiarity with the appearance of the plug and core, as installed in his car, especially after even a comparatively brief period of use has stained the core, would scarcely make him likely to be deceived by a core not contained in a carton, and with no marks directly suggesting plaintiff's structure, or merely because it fits the plug.

We also think injunction was properly denied against the use of the carton containing the distinct disavowal of plaintiff's manufacture and of its being supplied as Ford factory equipment. The order in No.

4070 is affirmed; costs of this court to be divided.

In No. 4071 the order of the District Court is also affirmed, with costs of this court. We think it governed by the considerations already discussed in the main case.