**REMINGTON–RAND, Inc., v. MASTER-CRAFT CORPORATION.**
No. 6136.

Circuit Court of Appeals, Sixth Circuit.
Oct. 13, 1933.

Marston Allen, of Cincinnati, Ohio (Allen & Allen, of Cincinnati, Ohio, and Barton A. Bean, Jr., of Buffalo, N. Y., on the brief), for appellant.

Otis A. Earl and D. B. Sharpe, both of Kalamazoo, Mich. (Mason & Sharpe and Chappell & Earl, all of Kalamazoo, Mich., on the brief), for appellee.

Before MOORMAN, HICKS, and HICKENLOOPER, Circuit Judges.

HICKS, Circuit Judge.

Suit by appellant, a Delaware corporation, against appellee, a Michigan corporation, for: (1) Unfair competition and unfair trade; and (2) infringement of claims 14 and 15 of patent No. 1,090,183, issued March 17, 1914, to George P. Wigginton, for a "temporary binder"; infringement of claims Nos. 1 to 13, inclusive, of patent No. 1,410,788, issued March 28, 1922, to Wigginton for a "binder"; and infringement of claim No. 5 of patent No. 1,494,519, issued to Wigginton on May 20, 1924, for a "temporary binder." These patents were assigned to appellant.

The bill, by indirection, also charges infringement of appellant's registered trade-marks, but it seeks no relief therefor and there is not sufficient evidence to support the averment. The court decreed that appellant's trade-marks had not been infringed; that the charges of unfair competition and unfair trade had not been sustained; that claims 14 and 15 of patent No. 1,090,183 and claims 1 to 13, inclusive, of patent No. 1,410,788 were invalid and void, and that, if valid, they were not infringed; and that claim 5 of patent No. 1,494,519, if valid, was not infringed.

From 1906 to 1927 Kalamazoo Loose Leaf Binder Company, herein called the Kalamazoo Company, a Michigan corporation, was engaged, at Kalamazoo, in the manufacture and sale of office equipment and particularly loose leaf binders and filler sheets therefor. It had grown, under the direction of George P. Wigginton, its general manager, until it did an annual volume of business of between $1,400,000 and $1,700,000. Its plant force had increased from about forty employees to more than two hundred and it had a sales force of about one hundred and five men, with forty-three sales offices. By reason of the corporate name, the location of the business at Kalamazoo, the use of its trade-marks and the fortunate administration of its business affairs, the company's binders came in time to be called "Kalamazoo" binders.

In September, 1927, appellant was organized through the merger of a number of corporations, which were then engaged in the manufacture and sale of office equipment, including, among others, the Kalamazoo Company. Appellant acquired all the stock of the Kalamazoo Company, together with its physical property, assets, and good will, including the patents herein sued on, for which it exchanged its own stock. This stock was in turn distributed pro rata to the stockholders of the Kalamazoo Company. The purchase became effective on January 1, 1928. Appellant also took over all of the officers and employees of the Kalamazoo Company, including its entire sales organization.

From the date of the merger there was dissatisfaction among many of the old Kalamazoo salesmen. Their territories had been changed and they were required to sell the entire line of Remington-Rand products rather than the specialized binder line to which they had been accustomed and they could not make as much money as they had with the old company. Many of them left the service of appellant and as early as May, 1928, discussions arose among some of them looking to the formation of a competing company.

While still in the service of appellant, Joseph W. Hamilton, who had been a salesman for the Kalamazoo Company with headquarters at Kalamazoo, and who, after the merger, represented appellant in the same territory, was active in the formation of appellee, especially in raising capital among bankers and business men of Kalamazoo. Leon L. Allyn, who had been a stockholder, director, and an assistant manager of appellant and of the old company, severed his connection with that company in July, 1928, to become president and a director of appellee. H. J. Broomhall, a director of appellant and of the old company and one of the zone managers of appellant, also resigned to become secretary and treasurer and a director of appellee.

The new organization was completed on September 13, 1928, with the corporate name, "Loose Leaf Binder & Equipment Company." The record leaves no room for doubt that appellant was, from the beginning, aware of the activities of those of its agents and employees who were engaged in the promotion of the new corporation.

Appellee went into production in January, 1929, but did not reach its capacity until April of that year. Its plant and principal offices were located at Kalamazoo. It employed a number of craftsmen directly

from the old Kalamazoo plant which appellant continued to operate. It also employed about twenty-six of Remington-Rand's salesmen.

The similarity in name of the Kalamazoo division, or subsidiary, of appellant, "Kalamazoo Loose Leaf Binder Company," with that of appellee, used in connection with the business address, Kalamazoo, Mich., gave rise to confusion. Orders and other communications addressed to the new company were received by the old. Early in January, 1929, appellant complained of this condition, and in April appellee changed its corporate name to "Master-Craft Corporation." After the change of name there were very few instances of misdirected mail and it must be assumed that the change substantially corrected the trouble. We find no substantial evidence of further use by appellee of the word "Kalamazoo" except for locating its plant and in connection with its business address. Furthermore, appellant did not show that it suffered damage on account of similarity in the respective corporate names.

But appellant complained in its bill that, even after the change, appellee continued to use the old name in connection with the new, and to associate the new name with the name of the city, Kalamazoo; that appellee appropriated the appearance of appellant's binders, and that it hired away some of appellant's salesmen and employees, for the purpose of securing confidential trade information belonging to appellant; and that all these acts were done as a part of a preconceived scheme to destroy appellant's business and to mislead and deceive its customers by "palming off" appellee's binders as those of appellant.

 There is no satisfactory evidence of any specific attempt of appellee's salesmen to sell its binders as those of appellant. Typical instances are found in the testimony of Mrs. Wise, of the Consumers' Coal Company, who stated that she placed an order with Mr. Evans of Master-Craft without knowing that he had left Remington-Rand, but that Evans later apologized and stated that he thought he had mentioned changing concerns; and in the testimony of Mrs. Ferrington of Chaffee Company, who stated that she was under the impression that the salesman from whom she purchased was working "for the Kalamazoo Loose Leaf" instead of appellee, but she could not repeat any misleading statement he may have made. If appellee practiced unfair competition (sold its goods as those of appellant, Vogue Co. v. Thompson-Hudson Co., 300 F. 509, 512 [C. C. A. 6]), the evidence

of it must be deduced from circumstances rather than direct testimony.

It is urged as highly significant that appellee's binders were similar in color, form, dress, and general appearance to those of appellant.

It is conceded that there is similarity in the particulars mentioned, but, aside from whatever rights appellant's patents may confer, it has no monopoly of the characteristic elements complained of. These features are functional. Loose leaf binders of the thong or thong and post variety are common articles of commerce which appellee may produce and sell so long as it excludes the idea that they are manufactured and sold as the goods of appellant. Subject to this limitation it may go into the open market and purchase its own stock, whether of leather, imitation leather, canvas, bakelite, keratol, or other material, and may adopt such colors and designs and produce such forms and varieties as its own judgment dictates or as the trade requires. See Moline Pressed Steel Co. v. Dayton Toy & Specialty Co., 30 F.(2d) 16, 18 (C. C. A. 6); Edward Hilker Mop Co. v. U. S. Mop Co., 191 F. 613, 619 (C. C. A. 6). Appellee's binders were not intermingled for sale with those of appellant in retail stores. They were sold from appellee's own branch offices and carried distinctive labels indicating their origin.

There is no basis for the claim that appellee either bribed or persuaded any of appellant's employees to violate their contracts with appellant or to leave its service. It appears from the testimony of Mr. Allyn and Mr. Hamilton, both of whom were witnesses for appellant, that on account of the dissatisfaction arising from the sales policy of appellant the salesmen, themselves, were the first to suggest the organization of a new company, and it stands undisputed that no employee of appellant was hired until he first approached appellee in search of new employment. No officer or agent, authorized to act for appellee, intentionally enticed from appellant any of its salesmen for the purpose of acquiring appellant's price lists or other confidential information.

Clyde H. Arend and A. G. Van Loozen were former sales agents of the Kalamazoo Company and of appellant. They afterwards became sales agents for appellee. Arend retained his old price book and Van Loozen retained certain copies of customers' orders, three in number; but the evidence is that such materials were not of a very valuable or confidential nature and they were returned

to appellant, upon request, without delay and there is no evidence that the possession of the old price book, or the copies of the orders, was known to appellee or any of its officers, or condoned by them.

Nicholas H. Stuart testified that, while he was doing experimental work for the Kalamazoo Company before the merger, he perfected for that company a certain "trigger" mechanism to be used upon loose leaf binders (for which a patent No. 1,778,283 issued to him October 14, 1930), and that this device was shown to Mr. Allyn, at that time with the Kalamazoo Company, and that after the merger appellee appropriated the device; but Mr. Allyn testified that he had never seen Mr. Stuart's mechanism or any part of it, and it further appears that the device used by appellee was that patented under patent No. 1,772,475, August 12, 1930, to Allyn himself.

■ Appellant complains that appellee engaged in price cutting. The record discloses a few isolated instances of this practice, but it is conceded that price cutting does not of itself constitute unfair trade. In one instance, at least, by a sale to the state of Pennsylvania of a large number of binders, appellee secured some of the business at a lower price than that made by appellant. This sale was the culmination of nothing more than ordinary rivalry in business. We do not find that appellee adopted price cutting as an element in a scheme to trade unfairly.

■ The defenses to the suit upon claims 14 and 15 of patent No. 1,090,183 to Wigginton were: (1) Noninvention; and (2) lack of infringement.

This patent expired before the decree was entered below. On the record it is called the S-spring patent. Claim 14 is printed in the margin.[1] The controversy is over the following element of this combination claim, to wit, "an S-shaped spring connected at one end to said stud and at the other to said back strip." To understand the function of this element it is necessary to describe briefly the loose leaf binder in which it operates.

The binder consists of two covers connected at the back by straps or thongs which may be lengthened or shortened as loose leaf filler sheets are inserted or removed. A recess in one of the covers contained a mechanism by which the thongs were tightened or loosened. The sheets had slots at one edge which could be fitted around the thongs or straps. In an ordinary book the back edges of the sheets are protected by the back of the binding. But a permanent binding is not possible where the number of sheets fluctuates. To meet this situation a back piece of cloth or other material was adjustably fastened in one cover and telescoped into a pocket in the other. As sheets were added this back piece would slip out of the pocket, thus furnishing an adjustable protection for the sheets in the binder; but when the binder was opened or when its volume was diminished, this back strip had a tendency to "buckle" or wrinkle.

In the early days, wrinkling of the back strip was prevented by attaching the free edge of the back piece within the pocket in the cover to one end of an elastic strip, the other end of which was fastened to the thong-adjusting mechanism. The tension of the elastic would keep the back piece taut. See patents to Bushong, No. 851,275—1907; No. 851,276—1907. But elastic strips would deteriorate, so the better to accomplish the same purpose, Impey (patent No. 979,673—1910) and Manning (patent No. 1,002,291—1910) used coil springs. Wigginton (patent No. 1,022,452—1912) used two overlapping rod springs fastened to the back strip by a cord.

Finally, the record discloses that, as early as 1910, the Kalamazoo Company used a double U-spring located in the ratchet mechanism just as the S-spring is located in the patent in suit. The S-spring in patent No. 1,090,183 functions in substantially the same way and accomplishes substantially the same result as the rod springs in Wigginton No. 1,022,452, and the double U-spring just above mentioned. We find no inventive genius in the substitution of plaintiff's S-spring for a double U-spring or the rod spring of Wigginton or even the coil spring of Impey and Manning. The improvement (if it is an improvement) is in degree only. Blackmore v. Ford Motor Co., 56 F.(2d) 806 (C. C. A. 6); Newcomb, David Co. v. R. C. Mahon Co., 59 F.(2d) 899, 901 (C. C. A. 6).

Claims 14 and 15 of patent No. 1,090,183 must be held invalid.

[1] "14. In a temporary binder, the combination with the covers, one of the covers being provided with a chamber open at its inner end, a longitudinally slotted partition plate arranged in one of the cover chambers, a back strip extending between the covers arranged to the rear of said plate, a rack bar arranged in front of said partition plate above said slot therein, a binding strip extending between the covers, an adjusting member for said binding strip, arranged on said rack bar, a stud on said adjusting member projecting through said slot, and an S-shaped spring connected at one end to said stud and at the other to said back strip."

■■ The second patent in suit is Wigginton No. 1,410,788, claims 1 to 13, inclusive, are involved. Claim 1 (printed in the margin[2]) incorporates more in detail than do the others the features claimed. This patent is generally referred to in the record as the "double removable post bar patent." It is for a binder combining the "thong" type and the "post" type. This patent is an exact duplicate of the prior Wigginton patent, No. 1,-174,458, with one difference—the location and arrangement of the posts. This difference or feature appears as an element in all claims, as follows: "Binding posts on said post bars disposed out of alignment to engage said holes in said sheets."

The patent may be better described by referring to the earlier patent. In that patent there was hinged to the back edge and on the inside surface of each cover of the binder, a flat metal clamping bar, by means of which the pressure from the thongs was applied to the sheets. This arrangement was old, but as depicted in Figures VIII and XIII, a second set of bars, called "post retaining bars," was provided. These bars were flat, and one of each was fitted against the inner side of the opposite clamping bars. They were kept from slipping by studs on their back which socketed into small holes in the clamping bars. Posts, which were really large headed screws, passed through holes in the top post retaining bar and through holes in the sheet body, and threaded into holes in the lower retaining bar. When the binding strips or thongs were tightened, these post retaining bars fitted flatly and snugly against the clamping bars and securely held the sheet body, but when the thongs were loosened the studs came out of the sockets and the post retaining bars, with the sheets held intact on the posts, could be removed from the cover, but when the posts or screws were removed there was nothing to hold the sheets in alignment.

The patent in suit proposed to overcome this difficulty. It used the old clamping bars and the old post retaining bars with a new name, "post bars," in the same relationship as in patent No. 1,174,458, but instead of one set of posts connecting the post bars, it provided a set upon each post bar. The bases of these posts were screwed into the post bars, and the other ends remained free and protruded oppositely from each post bar toward the other. These posts were long enough to pass almost entirely through the sheet body. It was possible through this provision of two sets of posts to hold in place, on one set or the other, almost the entire sheet body, thus handily giving access to any portion of the sheet body where it was desired to insert or remove an individual sheet without upsetting the alignment of the holes in the sheet body.

This was an improvement, no doubt, but it was not necessarily invention. Two removable bars, detachable from the clamping members, were found in Montgomery, No. 755,380, March 22, 1904. The bars in Montgomery are in the nature of cylindrical rods, but they are clearly the equivalent of the flat post bars of the patent in suit. Upon each of these bars are cylindrical posts extending through the sheet body, and so constructed that the posts upon one bar will telescope with those upon the other. The bars and posts of the Montgomery patent, when manipulated as designed, will perform all the functions of the post bars and posts of the patent in suit. We do not think that it required more than the application of mechanical skill and experience to arrange the posts upon each transfer bar alternately instead of telescopically, as in Montgomery. See J. Sidney Condit v. Jackson Corset Co., 35 F.(2d) 4, 6 (C. C. A. 6); Newcomb, David Co. v. R. C. Mahon Co., supra.

But, laying the question of the validity of this patent aside, we find no basis for the charge of infringement. As indicated, the specifications of patent No. 1,410,788 provided two transfer or post bars between the clamping bars and the filler sheets. Each of the claims in suit has the corresponding element "post bars." The plural is used. None of appellee's models 3, 4, 8, 13, or 14, which are charged to infringe, have two, or a pair, of post bars. They each have, only, a single post bar. The claims in suit do not read upon appellee's structure. Cimiotti Unhairing Co. v. American Fur Refining Co., 198 U. S. 399, 410, 25 S. Ct. 697, 49 L. Ed. 1100; Directoplate Corporation v. Donaldson Lithographing Co., 51 F.(2d) 199, 202 (C. C. A. 6).

---

[2] "1. In a temporary binder, the combination with sheets, provided with open notches in their binding edges and with holes adapted to receive posts, of covers, clamping members pivotally connected to said covers, and having holes therein, binding strips extending between said covers and adapted to engage said notches of said sheets, said binding strips being arranged through said clamping members and provided with adjusting means, post bars notched to receive said binding strips and provided with pins engaging said holes in said clamping members whereby said post bars are removably retained thereon, and binding posts on said post bars disposed out of alignment to engage said holes in said sheets."

■ The third patent in suit is Wigginton No. 1,494,519. Claim 5 is involved and is printed in the margin.[3]

Each element of the combination is old. The element "disengageable and extensible coupling members for said binding bars disposed at the end thereof" is old. Stripped of its verbiage, this element describes a coupling with a swivel post connection at one end and a threaded screw cap at the other. A pertinent illustration is found in Cline No. 629,-889—1899. The claim "exhibits nothing more than a judicious selection of well-known devices, obvious to their purposes." Globe-Wernicke Co. v. Fred Macey Co., 119 F. 696, 702 (C. C. A. 6); Adams v. Galion Iron Works & Mfg. Co., 42 F.(2d) 395 (C. C. A. 6); Newcomb, David Co., Inc., v. R. C. Mahon Co., supra.

But it is unnecessary to determine whether the combination connotes invention, for infringement is not shown.

Appellant's Exhibit 93, which is appellee's model 24 and which is the structure complained of, does have a transfer bar provided with sectional posts but this transfer bar is not removably engaged with the upper binding bar. It has no projecting studs upon its back. It lies in contact with the upper binding bar, but does not engage with it, and is not carried by it.

■ Finally, it was urged in the court below, and here, that appellee is estopped to deny the validity of the patents in suit because Allyn, Broomhall, and Hamilton, who were among its incorporators, were officers, directors, and stockholders in the Kalamazoo Company at the time that company assigned these patents to appellant; that as stockholders of the Kalamazoo Company these individuals received their share of the proceeds of these patents in the stock of appellant. We do not yield to this contention. Estoppel should be established with certainty. We fail to find any sufficient basis for it here.

Appellee was not organized until about nine months after these patents were assigned to appellant. It, of course, as a legal entity, never owned them. Appellee is not in privity with Allyn, Broomhall, and Hamilton. It is not their "alter ego," and it is not shown that they ever dominated or controlled appellee. As officers in the Kalamazoo Company they undoubtedly voted for the merger, which carried with it the assignment of these patents to appellant, but they were never owners of the patents and it is not shown that they promoted the merger, or that these patents were taken into consideration in bringing it about, or that any special value was ever placed upon them. As was stated in Babcock & Wilcox Co. v. Toledo Boiler Works Co., 170 F. 81, 83 (C. C. A. 6) touching a somewhat similar situation, "it is doubtful whether at the time either party knew of or cared about these patents."

The decree of the District Court is affirmed.

[3] "5. In a temporary binder, the combination with covers connected by a flexible back, of binding bars hinged within said covers, the bottom binding bar being provided with relatively fixed sectional posts, a transfer bar provided with sectional posts and removably engaged with the upper binding bar, and disengageable and extensible coupling members for said binding bars disposed at the ends thereof."